**UNITED STATES, Appellee,**

v.

**Francis H. WOODWARD, Defendant, Appellant.**

No. 97–1429.

United States Court of Appeals, First Circuit.

Heard March 6, 1998.

Decided July 20, 1998.

See also: 85 F.3d 713.

Bruce A. Singal, with whom William C. Athanas, and Donoghue, Barrett & Singal, P.C., were on brief for appellant.

John M. Griffin, Assistant United States Attorney, with whom Mark W. Pearlstein, Acting United States Attorney, was on brief for appellee.

Before BOUDIN, Circuit Judge, BOWNES and CYR, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

This case is the sequel to *United States v. Sawyer*, 85 F.3d 713 (1st Cir.1996), as we discuss in detail *infra*. Appellant Francis H. Woodward appeals his four-count conviction for mail and wire fraud, 18 U.S.C. §§ 1341, 1343; interstate travel to commit bribery, 18 U.S.C. § 1952 (the "Travel Act"); and conspiracy to commit those offenses, 18 U.S.C. § 371. The charges stem from his acceptance of illegal gratuities from William Sawyer and others, with the intent of depriving Woodward's constituents of his honest services as a legislator. In this appeal, Woodward claims that the evidence was insufficient to establish his guilt beyond a reasonable doubt on any of the four counts. He also argues that the district court erred in certain evidentiary rulings and in its jury instructions. We affirm.

I

*Facts*

When reviewing an appeal from a conviction, we view the facts in the light most favorable to the verdict. *United States v. Gonzalez–Maldonado*, 115 F.3d 9, 12 (1st Cir.1997); *Sawyer*, 85 F.3d at 731. Francis H. Woodward was first elected to the Massachusetts House of Representatives in 1977. He was assigned to the Joint Committee on Insurance ("Insurance Committee"), and served as the Committee's House Chair from January, 1985 through January 19, 1991. Beginning January 20, 1991 and continuing through April 1992 when he resigned from the legislature, Woodward was assigned to the Transportation Committee, which had no jurisdiction over insurance matters.

During the relevant time period, John Hancock Mutual Life Insurance Company ("Hancock") was one of the two largest life insurance companies in Massachusetts, and one of the ten largest in the entire United States. Because Hancock is domiciled in Massachusetts and is regulated primarily at the state level, Massachusetts' laws and regulations have a major impact on Hancock, affecting such issues as the corporation's organization and funding.

William Sawyer was the senior legislative counsel in Hancock's Government Relations Department. He was responsible for lobbying the Massachusetts legislature on behalf of bills favored by Hancock and the industry, and against those bills they opposed. He actively lobbied the Insurance Committee.

Hancock was also a member of an industry trade association known as the Life Insurance Association of Massachusetts ("LIAM"). LIAM also employed lobbyists who worked on Massachusetts legislation, in coordination with the lobbyists of its member companies. Sawyer was an active participant in LIAM as well.

Bills filed in the Massachusetts legislature were assigned to committee by subject matter. The Insurance Committee, comprising eleven representatives and six senators, was one of the principal legislative committees to which legislation of interest to Hancock and LIAM was assigned. From 1985 through 1990, the Insurance Committee received, on average, three hundred bills a year, one hundred of which affected the life insurance industry. Of those bills, the industry was interested in passing an average of only five per year; it opposed the rest.

The committee's procedures were, in general, as follows. First, public hearings were held on the bills. Following such hearings, the members of the committee voted on the bills in executive sessions that were open to the public. If the bill received a favorable recommendation in the committee's executive session, it was reported out favorably for further action on the floor of either the House or the Senate. If it received an unfavorable recommendation or a study order in the committee's executive session vote, then

in all likelihood the bill would not pass in that session.

The Insurance Committee was co-chaired by one House and one Senate member. The co-chairs, Woodward and his Senate co-chair, directed the activities of the committee, supervising the committee staff and scheduling all public hearings, executive sessions, and meetings. As co-chair, Woodward had the authority to assign bills to the hearing calendar and subsequent executive sessions, and to take other action that would help to advance bills through the committee (or he could choose not to take such action). Woodward also had the authority to affect the disposition of a bill, including the ability to "carry"[1] a bill through the legislative process or to send it to "study," which effectively shelved it.

As one of the four most active lobbyists on behalf of domestic life insurance companies, Sawyer was frequently present at Insurance Committee meetings. He saw Woodward two or three times a week, and was the lobbyist who met most often with Woodward. After Woodward was removed from the Insurance Committee in January 1991, Sawyer continued to appear at committee meetings and to meet with Woodward's successor as House Chair with the same frequency as he had before.

At the heart of the government's case was the evidence of Sawyer's expenditures on Woodward for shared meals and entertainment. From 1984 through 1992, Woodward accepted in excess of $9,000 in gratuities from Hancock and LIAM through their lobbyists Sawyer and William F. Carroll, the president of LIAM. Hancock provided the majority of this largesse, at least $8,740 in meals, rounds of golf, and other entertainment.

The government introduced evidence showing that, from March 28, 1984 through January 23, 1992, Sawyer expended $8,740 on behalf of Woodward. Of that total, $1,827 was expended after the statute of limitations period began, i.e., after July 27, 1990. One thousand three hundred forty dollars ($1,340) of the total expenditures occurred after January 19, 1991, when Woodward was removed from the Insurance Committee.[2]

Sawyer's expenditures consisted of (1) shared meals and entertainment at conferences, generally once or twice a year; (2) miscellaneous meals and rounds of golf each year in Massachusetts; (3) a dinner at the annual Fourth of July social gathering on Cape Cod; and (4) a trip in January 1986 to the Super Bowl in New Orleans. Expenditures from categories (1) and (2) are the subject of this appeal on the sufficiency issue. The jury acquitted Woodward as to category (3) expenditures. Evidence relating to the Super Bowl was not the subject of the indictment, but was admitted, over Woodward's objection, to show the nature of the conspiracy and for its bearing on intent; Woodward appeals the admission of that evidence.

The National Conference of Insurance Legislators (COIL) is a national association of state legislators involved in insurance matters. Every year the organization sponsored one or more conferences for legislators, at various sites around the country, where educational presentations were made concerning insurance matters. Woodward attended many COIL conferences, as did other legislators from Massachusetts and elsewhere. Legislators' travel and hotel expenses were paid from a legislative account or campaign funds but not by the insurance industry. Woodward and Sawyer frequently played golf at exclusive clubs near the conference site, and Sawyer generally paid the costs of the golf. Sawyer used his corporate credit card to pay for business-related expenses. He submitted an expense account statement with receipts, and Hancock reimbursed Saw-

---

1. The parties dispute whether "carrying" means merely signing paperwork, or whether it means advocating or leading the debate for the bill. As we discuss *infra* at 60–61, accepting the facts in the light most favorable to the verdict, "carrying" implies active involvement rather than merely ministerial paperwork.

2. Woodward argues, as he did at trial, that expenditures occurring after that date are irrelevant to the charges against him because they "came after any potential utility of Woodward to the life insurance industry had ended." The jury acquitted him of all substantive charges stemming from gratuities received after the end of 1990.

yer for such expenses. In addition, Sawyer paid for a number of dinners at local restaurants that would be attended by legislators such as Woodward who were attending the conferences. At times, William Carroll of LIAM would pay for the dinners. Sawyer/Hancock also paid for Woodward's entertainment while at these conferences, such as tickets for the Grand Ole Opry when the conference was in Nashville.

In addition to the COIL conference expenditures, Sawyer paid for Woodward's meals at expensive restaurants, as early as 1984, when Woodward was in the Legislature but before Woodward served as co-chair of the Insurance Committee. This practice continued throughout the years Woodward remained in the House, with higher amounts generally in the years he was committee chair. Sawyer also paid for an average of three to five golf outings with Woodward each year at various locations in Massachusetts. These were principally at Sawyer's private golf club, the Woodland Golf Club. Hancock also paid for other forms of entertainment, including boat rentals and tickets to tourist attractions such as Busch Gardens.

The government introduced into evidence a chart showing the amount of annual gratuities accepted by Woodward. The pattern formed by these amounts is noteworthy. In 1984 and 1985, before Woodward became chair of the Committee and for the first year afterward, Woodward accepted gratuities in the range of $200–300 from Sawyer/Hancock. In 1986 there was a marked increase to $2,527, including over $1,800 to cover the air fare, hotel, and tickets (for him and his wife) to attend the Super Bowl in New Orleans. In 1987–91, Woodward received gratuities in the amount of $1,547, $1,093, $513 [3], $1,230, and $1,324. Woodward served as committee chair during all but the last of these years. During his last four months in the legisla-

ture, January through April 1992, he received only $16, and his gratuities dropped to $0 after he resigned from office in April. After Woodward was replaced as committee chair by Rep. Francis Mara, Sawyer began wining and dining Mara in the same manner as he had Woodward. *Sawyer*, 85 F.3d at 721.

In addition to Sawyer's payments on behalf of Woodward, LIAM lobbyists also paid for some of Woodward's meals during the period of the charged conspiracy (1984–92). These amounted to $444.

Woodward's official actions, for the most part, conformed with the way Sawyer and Hancock wanted the recipient of their gratuities to conduct himself. Sawyer was the lobbyist with whom Woodward met the most, according to Robert J. Smith, the research director for the Insurance Committee. They met approximately three times a week when the legislature was in session. And Woodward repeatedly acted on behalf of Hancock and the life insurance industry in his capacity as co-chair of the Committee.

According to Smith, Woodward was the most pro-life-insurance-industry chair of the Insurance Committee during Smith's tenure, 1985–95 (which included six other House and Senate chairs). Woodward actively supported the industry's position on most bills of importance to the industry.

As his defense to the charge that he engaged in illegal theft of honest services, Woodward presented evidence that Sawyer's expenditures on his behalf were based not on bribery but on their "close" friendship. In addition to their business relationship, Woodward and Sawyer maintained a personal relationship. They met in the late 1970s, which is the time Woodward began serving on the Insurance Committee. The two families socialized together even before Woodward as-

---

**3.** The evidence relating to 1989 appears to underrepresent the actual amount of gratuities received in that year. The numerical evidence in the chart came from Sawyer's expense accounts submitted to Hancock for reimbursement. For years other than 1989, if Woodward participated in a particular event, then Sawyer's expenditure on that event was divided among the number of participants in order to calculate, as closely as possible, the share received by Woodward. In

1989, for a conference on Amelia Island, Sawyer's records do not reflect which legislators participated in which events. Therefore it was not clear what share each individual legislator received of the $5,282 of Sawyer's total expenses for the conference. Thus, although the records reflect that Woodward did share in the total expenditures, the calculation of his annual gratuities for 1989 does not include Woodward's share of the Amelia Island expenses.

sumed the chair of the Committee in 1984. The two couples drove together to a conference in New York in 1980, and the Sawyers and their children visited the Woodwards at the latter's house on Cape Cod as early as 1982. Beginning in about 1984, the Sawyers would traditionally stay at the Woodwards' house on the Cape for an annual Fourth of July weekend gathering. The two families also shared other times, including family celebrations and tragedies. Mrs. Woodward testified that the Sawyers were one of three couples with whom the Woodwards were the closest.

The jury convicted Woodward of four[4] (of the twenty-eight) charges against him: one count each of mail and wire fraud, one count of interstate travel to commit bribery, and one count of conspiracy to commit the foregoing three offenses.

## II

### Requisite Intent Under Mail and Wire Fraud Statutes

■ To support a conviction for mail or wire fraud, the government must prove beyond a reasonable doubt: "(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme." *Sawyer*, 85 F.3d at 723; *see* 18 U.S.C. §§ 1341, 1343.[5] "[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346; *see Sawyer*, 85 F.3d at 723–24.

The government charged that Woodward engaged in a scheme to deprive the Commonwealth of Massachusetts and its citizens (collectively, "the public" or "citizenry") of their right to his honest services as a state legislator, performed free from deceit, fraud, dishonesty, conflict of interest, and self-en-

richment. In addition to this general duty of honest services, the government charged that Woodward had a specific duty to abide by Massachusetts reporting requirements. With regard to the scheme to defraud, the government charged, inter alia, that Woodward accepted, from individuals (including Sawyer) representing Hancock and LIAM, golf, meals, tickets, and other entertainment and benefits, in violation of Massachusetts law; that Woodward filed false Statements of Financial Interest ("SFI") under oath, in which he unlawfully failed to report to the State Ethics Commission his receipt of the gratuities; that Sawyer on behalf of Hancock and LIAM was given greater access to the Insurance Committee and to Woodward as House Chair than was available generally to the citizenry; and that, from 1984 through 1990, Woodward repeatedly performed official acts on behalf of Hancock and LIAM. The government further charged that Woodward used the mails and interstate telephone wires in furtherance of the scheme, in violation of 18 U.S.C. §§ 1341 and 1343.

In *Sawyer*, we discussed mail and wire fraud in connection with theft of honest services in a closely analogous situation where the same facts formed the backdrop for the case. We particularly highlighted the intent required to support a conviction; intent is also a major issue in the present case. But as Woodward stresses, his situation—as the legislator—is not exactly identical to that of Sawyer as the lobbyist. We will, therefore, summarize our analysis in *Sawyer*, insofar as is applicable here.

■ We explained that, prior to *Sawyer*, honest services fraud had typically been found in two types of circumstances: (1) bribery, where a legislator was paid for a particular decision or action, or (2) failure to disclose a conflict of interest, resulting in personal gain. 85 F.3d at 724. As to the latter, we noted that "[a] public official has

---

4. To be more precise, the jury convicted him of five charges, but the district court dismissed one of them as multiplicitous.

5. In relevant part, 18 U.S.C. §§ 1341 and 1343 provide:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice ... [shall be punished].

an affirmative duty to disclose material information to the public employer. When an official fails to disclose a personal interest in a matter over which she has decision-making power, the public is deprived of its right either to disinterested decision making itself or, as the case may be, to full disclosure as to the official's potential motivation." *Id.* (citing *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir.1987)). "Thus, undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services." *Id.* The *Sawyer* case expanded category (1) from quid pro quo bribery, to include a more generalized pattern of gratuities to coax "ongoing favorable official action." *Id.* at 730; *see infra.*

"The broad scope of the mail fraud statute, however, does not encompass every instance of official misconduct," even of "reprehensible misconduct," "that results in the official's personal gain." *Sawyer*, 85 F.3d at 725. The government must prove that the defendant intended to deprive the public of its right to the honest services of its legislators. *Id.* at 725, 730.[6]

> This intent could be shown in a number of ways. For example, a bribery-like, corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful gratuity with the intent to effect a specific quid pro quo. Rather, as the government contends here, a person with continuing and long-term interests before an official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services.

*Sawyer*, 85 F.3d at 730 (noting that "[s]uch conduct would be akin to (although not a classic case of) the conflict of interest cases noted" previously).

Applying this principle to the facts adduced, we stated that, "while Sawyer may not have provided the legislators with direct

kickbacks or commissions arising out of the specific official action, he may have intended the legislators generally to treat preferentially Hancock's interests, knowing that the free meals, entertainment, and golf would continue so long as favorable official acts were, at some point, taken." *Id.* We reversed the mail and wire fraud convictions, nevertheless, because we could not be sure that the jury convicted Sawyer based upon the Massachusetts gift statute (as a basis for the federal scheme to defraud) or the Massachusetts gratuity statute, and the former had been improperly charged in the court's instructions to the jury. We mandated a protective instruction to be used in cases such as this, which would help the jury understand the difference between "reprehensible misconduct" which is *not* a violation of federal law, and misconduct which does form the basis for a federal conviction. *Id.* at 741. Noting that prior cases usually involved "quid pro quo bribery or blatant conflict of interest," which was clearly illegal, we distinguished Sawyer's gratuities to Woodward (and other legislators) as involving conduct which "itself may not be very different, except in degree, from routine cultivation of friendship in a lobbying context," which does not violate federal criminal law. *Id.* We noted that "[t]he practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive." *Id.* Because the "difference between lawful and unlawful turns primarily on intent," we held that the court must instruct the jury that a lobbyist does not commit honest services fraud or violate the Travel Act if his "intent was limited to the cultivation of business or political friendship." *Id.* He commits those violations "only if instead or in addition, there is an intent to cause the recipient to alter her official acts." *Id.*

### III

#### *Sufficiency of the Evidence*

Woodward's principal argument on appeal is that there was insufficient evidence for the jury to find beyond a reasonable doubt that

---

6. The intent to deprive the public of honest services is distinct from the intent to deceive the public, which also must be proven (or some

equivalent deceptive intent) as part of mail fraud's "scheme to defraud." *See Sawyer*, 85 F.3d at 729 n. 12.

he had the requisite intent on any of the four counts at issue here. We will focus our discussion here on the mail and wire fraud counts. We held in *Sawyer* that the intent required for a Travel Act violation is the same as that for mail and wire fraud. 85 F.3d at 741. Woodward argues that the conspiracy count must fall because there is insufficient evidence to support the substantive counts that served as its objects.

Because theft of honest services constitutes a "scheme or artifice to defraud" within the meaning of the mail and wire fraud statutes, *see Sawyer*, 85 F.3d at 723–24, the question becomes whether the jury could reasonably have found that Woodward intended to steal his honest services from the public. As Woodward phrased it in his brief, "[t]he central question is whether by accepting his friend's largesse Woodward intended to be influenced to support Hancock's legislative interests."

## A

### Standard of Review

■ In determining the evidentiary sufficiency of a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "The scope of review is over the totality of the evidence, both direct and circumstantial." *United States v. Czubinski*, 106 F.3d 1069, 1073 (1st Cir.1997).

Woodward focuses most of his sufficiency challenge on an alleged lack of intent to be influenced. He argues that the evidence was insufficient to show that Woodward accepted Sawyer's gratuities with the intent to deprive the public of his honest services by performing official acts on behalf of Hancock (or the life insurance industry).

■ Woodward "bear[s] a heavy burden" in arguing insufficiency of the evidence, even with respect to this intent element. *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988). "An appellate court plays a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests. The court of appeals neither weighs the credibility of the witnesses nor attempts to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Noah*, 130 F.3d 490, 494 (1st Cir.1997). We "defer, within reason, to inferences formulated by the jury in the light of its collective understanding of human behavior in the circumstances revealed by the evidence." *United States v. Guerrero* 114 F.3d 332, 339 (1st Cir.1997) (internal quotation marks omitted), *cert. denied sub nom. Pilco v. United States*, — U.S. —, 118 S.Ct. 184, 139 L.Ed.2d 124 (1997).

■ In reviewing Woodward's contention, "we must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and we must affirm the convictions so long as, from the inferences reasonably drawn, the jury might fairly have found the requisite connection beyond a reasonable doubt." *Biaggi*, 853 F.2d at 99 (citations omitted); *see Sawyer*, 85 F.3d at 731.

As we stated in *Sawyer* (in the context of intent to deceive):

> The evidence need not compel an intent-to-deceive finding; rather, it is only required that a reasonable jury could be persuaded, beyond a reasonable doubt, that [Woodward] had such intent. And we are mindful that a jury may choose among the reasonable alternatives posed by the evidence. Finally, the specific intent to deceive may be proven (and usually is) by indirect and circumstantial evidence.

*Sawyer*, 85 F.3d at 733 (citations omitted).

■ "Despite the deference that characterizes appellate review of jury verdicts, juries do not have *carte blanche*. The appellate function ... requires the reviewing court to take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable

doubt." *United States v. Spinney,* 65 F.3d 231, 234 (1st Cir.1995) (citations omitted). "[A]n appellate court must reverse a conviction on the grounds of evidentiary insufficiency 'where an equal or nearly equal theory of guilt[ ] and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict.'" *Guerrero* 114 F.3d at 344 (quoting *United States v. Andujar,* 49 F.3d 16, 20 (1st Cir.1995)). In such cases, "a reasonable jury must necessarily entertain a reasonable doubt." *Andujar,* 49 F.3d at 20. Viewed in this context, we find that the government has met its burden of proof beyond a reasonable doubt.

## B

### *Intent (Counts 1, 4, 9, 14)*

In *Sawyer,* we noted two of the ways that a public official can steal his honest services from his public employer: (1) the official can be influenced or otherwise improperly affected in the performance of his duties, 85 F.3d at 724, 729; or (2) the official can fail to disclose a conflict of interest, resulting in personal gain, *id.* at 724. The government asserts that the evidence supports the jury's finding that Woodward had the requisite intent to deprive the public of his honest services in both of these ways. We agree.

### 1. *Influence in Official Action*

As Woodward states in his brief, "the government must [have] demonstrate[d] that there was sufficient evidence for a rational jury to conclude that Woodward accepted the free meals and entertainment from Sawyer with the intent to perform official acts to favor Hancock's legislative interests." Def. Br. at 19. Identical standards apply in determining the "scheme to defraud" element under the mail and wire fraud statutes. *Czubinski,* 106 F.3d at 1076 n. 10.

"The jury was entitled to infer [the defendant's] intent from the circumstances surrounding" his actions, from indirect, as opposed to direct, evidence. *United States v. Fulmer,* 108 F.3d 1486, 1493 (1st Cir.1997); *see United States v. Taylor,* 54 F.3d 967, 975 (1st Cir.1995) (noting that a

showing of criminal intent "may be made wholly on the basis of circumstantial evidence"). Nor are juries "required to examine the evidence in isolation"; "'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" *United States v. Ortiz,* 966 F.2d 707, 711 (1st Cir.1992) (quoting *Bourjaily v. United States,* 483 U.S. 171, 179–80, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)); *see also United States v. Montminy,* 936 F.2d 626, 627–28 (1st Cir.1991).

In *Sawyer,* we reviewed much of the same evidence that was presented to the jury here, and determined that the evidence was sufficient "to prove [Sawyer's] intent to influence the legislators' official acts." 85 F.3d at 731. We noted that Sawyer continually gave gifts for the purposes of gaining access and developing a relationship with Woodward and other legislators. From this, the jury could have inferred that Sawyer intended to induce official actions favorable to Hancock's interests. *Id.; see also id.* at 739 (noting that Sawyer gave items of substantial value to legislators like Woodward who had the ability to take official action favorable to Hancock, that those gifts ceased after the legislators left office, and that Sawyer had long-term ongoing interests in official actions and knew the gratuities were illegal; and concluding that the jury could rationally have inferred that "the gratuities were motivated by the legislators' performance of official duties, i.e., that they were given 'for or because of any official act,' within the meaning of the Massachusetts gratuity statute, Mass. Gen. L. ch. 268A, § 3.").

The same inferences regarding Woodward's intent can be drawn from the evidence here, based upon the nature and sequences of events, certain explicit statements, and the suggestions of a cover-up. In *Sawyer,* of course, the jury was assessing the motivation of the *donor* of the gratuity, Sawyer, not that of the *donee,* Woodward. But it is an equally valid inference, from the foregoing evidence coupled with the fact that Sawyer and Woodward spent a good amount of time

together, that Woodward understood the gratuities and their purpose in the same way that his "close friend" Sawyer did. Woodward knew that Sawyer was giving him items of substantial value, continuing over a long period of time; he knew that Sawyer had a long-term ongoing interest in his official acts; and that he had the ability to take official action favorable to Hancock. Woodward also knew that his relationship with Sawyer began after he became a member of the Insurance Committee and that the gifts increased substantially shortly after he became chair of the committee that handled insurance legislation. Finally, Woodward knew that, at many of the same entertainment events that he enjoyed, Sawyer also wined and dined other legislators in a similar manner, and those legislators had only a business relationship, not a friendship, with Sawyer. In light of all this, the jury could have inferred that Woodward knew what the deal was—that the gratuities would continue as long as he voted favorably to Hancock's interests, *see Sawyer*, 85 F.3d at 730—and that he intended to be influenced by the gratuities.

Moreover, the jury had additional evidentiary bases for drawing the inference that Woodward's intent included an illegal element rather than being solely based on friendship. After entertaining Woodward for several days at the Scottsdale COIL conference in 1991, Sawyer left the conference early, but left his credit card to be used for paying Woodward's golf and meal expenses during the remainder of the conference. This is not consistent with mere friendship as the sole purpose of the payments, but rather is more consistent with the theory of a gratuity made because of Woodward's potential official actions.

In addition, Woodward received some gratuities from Sawyer (although in lesser amounts) at events where other legislators—mostly members of the Insurance Committee, who could also influence legislative acts in favor of Hancock—were also present. This too indicates an illegal gratuity more than the camaraderie of "close friends." Similarly, some of Woodward's gratuities came from LIAM, through its president, Carroll, who was not a personal friend of Woodward's.

The same inference can be drawn from the fact that the expenditures were not mutual but rather operated in one direction only. The standard operating procedure was for Sawyer to pay for meals, drinks and golf for Woodward; Woodward did not make similar payments for Sawyer. If the reason Sawyer "picked up the tab" for Woodward on some occasions was simply because the two men were "close friends," one would expect there to be a roughly equal number of occasions on which Woodward "picked up the tab" for Sawyer. But that was not the case.

Indeed, the only evidence in the record as to Woodward performing some reciprocal acts of treating his "close friend" Sawyer were the weekends spent on Cape Cod. On those occasions, Woodward invited the Sawyers to stay at the Woodward family's house on the Cape, where the Woodwards cooked some meals. In return, according to Woodward, Sawyer would pay for a group dinner at a nearby restaurant.

Significantly, the jury returned not guilty verdicts on all indictments alleging such reciprocal expenditures. In contrast, the jury weighed the evidence differently as to four counts charging Woodward with accepting gratuities in a non-mutual, non-reciprocal way. As to these, the jury apparently viewed Sawyer's expenditures and Woodward's acceptance of them as *not* being based on the two men's friendship but rather based on a business relationship: i.e., insurance industry lobbyist and Chair of the Legislature's Insurance Committee. The jury recognized—and this recognition is supported by the evidence of record—that the two men had two types of relationships, a personal friendship and a business relationship. Woodward's acceptance of expenditures that were part of their friendship was not illegal, but his acceptance of expenditures in the context of their business relationship constituted theft of the honest services that Woodward owed to his constituents. We think the evidence was sufficient for a reasonable juror to so conclude beyond a reasonable doubt. The jury was free to "choose among the

reasonable alternatives posed by the evidence," *Sawyer*, 85 F.3d at 733, and we will not second-guess the jury's conclusion in this regard.

Another reason the jury could have rejected Woodward's contention that Sawyer picked up his tab solely because of friendship rather than as an attempt to influence is the direct statements showing how Woodward expected to receive gratuities from Sawyer (and, through him, from Hancock). In 1989, at a COIL conference in Florida, Lorraine Bohannon, the former staff director of the Insurance Committee, who reported directly to Woodward, went out to dinner with Woodward, Sawyer, and their spouses. There is no evidence that Bohannon had any kind of personal friendship with Sawyer. After dinner, Bohannon offered to Woodward to pay a portion of the bill, and Woodward's response was: "Don't worry about it; it's taken care of." Sawyer picked up the tab and was reimbursed by Hancock for the bill.

The government presented evidence of another direct statement to demonstrate Woodward's illegal intent. After Woodward left the legislature, he expressed interest in working for Hancock as a lobbyist. He asked Sawyer to help him obtain the job. Sawyer told Woodward he was not qualified for the job, and Woodward was "very hurt." Subsequently when he talked to Committee research director Robert Smith about the Hancock job, Woodward said, in effect, "After all I did for Bill Sawyer, you know, I can't believe he's not—he can't get me a job" or "he's not getting me a job." The prosecutor asked Smith whether Woodward told him what "he felt he had done for Bill Sawyer," and Smith replied, "Not specifically, just generally. 'After all these years as Chairman of the committee and trying to do the right thing and being willing to take on tough issues, I would—I expected, you know, more assistance than I received.'"

Woodward argues that this conversation does not demonstrate any illegal intent on Woodward's part. He points out that, at trial, Smith could not recall Woodward saying "after all I've done for Sawyer," but only "after all I've done." Woodward also notes that "trying to do the right thing" could have

meant following his own conscience, not necessarily doing the "right thing" for Sawyer and Hancock. Similarly, "taking on tough issues" did not necessarily mean "taking on tough issues" for Sawyer or Hancock. At trial, Smith testified that he did *not* interpret these phrases in an illegal manner.

But Woodward's argument is belied by the totality of Smith's testimony about the conversation, or at least a reasonable jury could have so inferred. In his grand jury testimony, which was used by the government at trial, Smith testified to the more directly inculpatory language: "after all I did for Bill Sawyer." And Smith's trial testimony covered additional incriminating evidence that Smith had revealed to the grand jury but did not include in his direct testimony at trial. When asked (at the grand jury session) to repeat the whole conversation, Smith testified:

> [Woodward] said that he had spoken to Bill Sawyer and that Bill Sawyer had been reluctant to help him, and Representative Woodward at that time—as many legislators do, they don't remember the specific bill numbers or subject matter, but they'll remember in general if they were favorable towards someone or not—said to me "you would think after all the years and everything I've done I would be treated better than I have been treated."

This juxtaposition of the "everything I've done" language with the notion of legislators "remember[ing] in general if they were favorable towards someone or not" carries a strong implication that, at least in Smith's mind as he heard Woodward make the quoted statements, Woodward's reference to "all he had done" was meant in the sense of taking action in the legislature to favor Sawyer and Hancock's interests.

Smith's grand jury testimony, elicited after an inconsistent statement at the trial, constitutes substantive evidence under Fed.R.Evid. 801(d)(1)(A). The jury, in assessing Smith's credibility in the context of all his testimony, could well have believed that Smith's grand jury testimony—with its incriminating inferences—was true; and the jury could have concluded that Smith's trial testimony was not believable to the extent it undercut the

grand jury testimony. On appeal, of course, we view the evidence in the light most favorable to the verdict, not the light most favorable to Woodward. Credibility assessments are properly left to the jury. *United States v. Mangual–Corchado*, 139 F.3d 34, 43 n. 20 (1st Cir.1998). And juries are not required to evaluate the evidence in isolation; "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." *Bourjaily*, 483 U.S. at 179–80, 107 S.Ct. 2775.

The inference of illegal intent grows even stronger when we consider another aspect of what Woodward told Smith about his attempt to persuade Sawyer to help him get a job at Hancock. According to Smith's trial testimony, Woodward said: "If he [Woodward] could not get the job himself he'd like to see his son Brian get the job." Smith testified that he was unaware of any experience that Woodward's son, Brian, had in insurance matters. This, too, carries the implication that Woodward was expecting some kind of reward from Sawyer/Hancock for all his years of favoring the industry's position in the legislature.

In addition, as Woodward recognizes, "[i]ntent can be inferred from a defendant's conduct, viewed in light of all the surrounding circumstances." Def. Br. at 19; *see, e.g., Gaunt v. United States*, 184 F.2d 284, 290–91 (1st Cir.1950). Thus "[t]he best evidence of Woodward's intent to perform official acts to favor Hancock's (and LIAM's) interests is the evidence of Woodward's actions on bills which were important to Hancock." *Id.* Unfortunately for Woodward, the evidence supports the jury's verdict, rather than undermining it as he contends.

█ It is not necessary for the government to link a particular gratuity with a specific act in order to obtain a conviction. *Sawyer*, 85 F.3d at 738–39; *see* discussion *supra* at p. 55. Nevertheless, Woodward disputes the extent to which, in his official capacity as chair of the Insurance Committee, he took action that served the interests of his benefactors. The evidence does not support his contention. According to Robert Smith, Woodward was the most pro-life-insurance-industry chair of the Committee, of

the seven House and Senate chairs with whom Smith worked during the ten years that Smith served as the Committee's research director. Woodward even took pro-industry positions in opposition to his own committee. As an example, in each year from 1985 through 1990, the legislature considered a bill proposing mandatory discounts on life insurance for non-smokers. Hancock and LIAM opposed the bill. In 1989, the bill received favorable recommendation from the Insurance Committee based on support from Senator Linda Melconian, Woodward's co-chair of the Committee. But despite the Committee's favorable report, Woodward led the opposition to the bill in debate before the full House of Representatives, and was successful in defeating the so-called "non-smoker's bill" for that session. Hancock's vice-president, who directly supervised Sawyer, called the bill's defeat a "significant victory for the industry."

Woodward also led the Insurance Committee to support and report favorably bills proposed by the industry. Among these were bills allowing life insurance companies to change the ways in which they valued real estate assets, to adjust pension funds, to provide financial services, and to be flexible in corporate governance and finance.

In addition, more than any other co-chair from 1985–95, Woodward "carried" bills sought by the life insurance industry. This means that, after the bill left the committee, Woodward served as the point person to push these bills through the legislative process.

Woodward challenges this characterization of the meaning of "carrying" a bill after it leaves committee. Woodward contends that "carrying" is merely a ministerial function, that it simply refers to the fact that the chair of any committee of the Massachusetts legislature "sign[s] the paperwork recommending a bill favorably and [is] available to answer questions from non-committee legislators when [the bill is] presented to the House or Senate floor." Woodward relies on Robert Smith's testimony for the proposition that carrying legislation does not *necessarily* mean advocating or leading the debate for the bill on the House floor, that that role is

normally reserved for the legislator who sponsors the bill.

Smith's testimony to this effect, however, was impeached with his grand jury testimony in which he had testified that "carrying" meant actively guiding bills through the legislative process. As we noted in discussing the conversations about getting Woodward a job at Hancock, the jury was entitled to believe this portion of Smith's testimony (i.e., introduction at trial of his prior grand jury testimony)—that "carrying" means actively guiding a bill through the process; it is not merely ministerial—and the jury was entitled to disbelieve other parts of his trial testimony that supported Woodward's interpretation to the contrary.

Woodward points to thirty-one (31) bills that he supported despite opposition on the part of Hancock and the insurance industry. But, as the government notes, the proper analysis is to examine all bills considered by the Committee in context, not to isolate a relatively small number of bills in an effort to show that Woodward was not 100% in the industry's pocket. The record reflects that, during his six years as co-chair of the Insurance Committee, there were approximately one hundred bills per year that were of interest to the life insurance industry, for a total of six hundred bills during his tenure. Woodward opposed the industry's position on only thirty-one of those bills. Moreover, at least ten of the opposed bills were duplicates of previously filed bills. Of the remainder, only three actually related to life insurance. The rest concerned mandated benefits for health insurance which were of less importance to the life insurance industry, in particular to Hancock. This is because, as Hancock's attorney testified, life insurance was Hancock's "big money earner in terms of profit." The company's group health insurance business was "[o]ne of the lesser profit earners." As already noted, several of the bills where Woodward's position conformed to the life insurance industry's positions were of great importance to the industry in that the bills significantly improved the industry's profitability.

Woodward relies heavily on *Czubinski*, 106 F.3d at 1076, where we cited *Sawyer* for the "most important[ ]" proposition that the government must do more than "merely indicate wrongdoing by a public official, but must also demonstrate that the wrongdoing at issue [was] intended to prevent or call into question the proper or impartial performance of that public servant's official duties." *Czubinski*, 106 F.3d at 1076 (citing *Sawyer*, 85 F.3d at 725). In *Czubinski*, we explained that *Czubinski's* "case falls outside of the core of honest services fraud precedents," in that he was "not bribed or otherwise influenced in any public decisionmaking capacity." *Id.* at 1077. We also distinguished *Czubinski's* "relatively straightforward" job—responding to information requests from the public— from "a discretionary, decision-making role," which "raise[s] the specter of secretive, self-interested action.". *Id.*[7] We found "no evidence that Congress intended to create what amounts to a draconian personnel regulation," by "transforming governmental workplace violations into [federal] felonies." *Id.*

The instant case is very different from *Czubinski*. As Woodward recognizes, Czubinski did not receive or intend to receive any tangible benefit from his conduct, whereas Woodward did. Additionally, Czubinski's official duties did not involve the discretionary, decision-making role of a legislator. "Notwithstanding these factual differences," Woodward asserts, "*Czubinski* and the instant case are similarly flawed by the failure of proof on the critical fraudulent intent element." We disagree. As discussed *supra*, the jury in the present case could justifiably have inferred the fraudulent intent element.

---

**7.** *Cf. United States v. Rabbitt*, 583 F.2d 1014, 1026 (8th Cir.1978) (finding no deprivation of honest services where state representative introduced friend's firm to public officials responsible for awarding city contracts, where defendant played no role in such awards and did not otherwise fail to fulfill his official duties, and where government cited no standard requiring defendant to disclose his interest in the contracts);

*United States v. McNeive*, 536 F.2d 1245, 1246 (8th Cir.1976) (finding no deprivation of honest services of city plumbing inspector despite acceptance of unsolicited gratuities, where inspector's administrative duties were non-discretionary and no evidence that gratuities deterred McNeive from conscientiously performing duties).

Woodward did receive tangible benefits here, as Czubinski had not. And the connection between the gratuities and Woodward's official acts could have been justifiably inferred from the fact that Woodward had discretion to act or not act in ways that would further the insurance industry's interests; this discretion extended both to the bottom line (support of or opposition to the industry's position on legislation) and to the degree of vigor with which Woodward championed the industry's positions.

### 2. Failure to Disclose Conflicts of Interest

 In addition to demonstrating Woodward's intent by evidence showing that he was influenced or otherwise improperly affected in performing his duties, the government argues that Woodward's intent is also demonstrated by his failure to disclose his conflict of interest although he was required to do so. We agree.

 Massachusetts law mandates such disclosure on his Statements of Financial Interest (SFIs). Mass. Gen. Laws ch. 268B, § 5 (West 1990). In addition, separate and apart from the state statute, "[t]he obligation to disclose material information inheres in the legislator's general fiduciary duty to the public." Sawyer, 85 F.3d at 733 n. 17. We recognized in Sawyer that the nondisclosure of a conflict of interest is a second way in which a public official can steal his honest services. 85 F.3d at 724; cf. id. at 728 ("[U]nlike the honest services fraud cases, noted above, in which an official was bribed or took official action based on a secret conflict of interest, a gift statute violation, even if intentional, does not itself amount to honest services fraud." (Emphasis added)). The evidence of Woodward's non-disclosure is also probative of Woodward's intent; it supports the jury's finding that he had the requisite intent.

As we stated in Sawyer:

A public official has an affirmative duty to disclose material information to the public employer. When an official fails to disclose a personal interest in a matter over which she has decision-making power, the public is deprived of its right either to disinterested decision making itself or, as the case may be, to full disclosure as to the official's potential motivation behind an official act.

Sawyer, 85 F.3d at 724 (citing Silvano, 812 F.2d at 759).[8]

In addition to the general "affirmative duty to disclose" discussed in Sawyer, Woodward had a specific statutory duty each year to file a Statement of Financial Interests with the Massachusetts State Ethics Commission. See Mass. Gen. Laws ch. 268B, § 5. Woodward was required to disclose on his SFI forms all gifts he or his immediate family received, aggregating more than $100 per year, from lobbyists or businesses that had a direct interest in legislation. He had to sign the forms under oath. Woodward did not report the gratuities he received from Hancock or LIAM on any of his SFI forms submitted for the years 1984 through 1992.

Woodward contends that his failure to comply with the Massachusetts reporting statute, while "reprehensible," is not relevant here. We disagree. In Czubinski, we listed "the failure of public decision-makers to disclose certain conflicts of interest" as one of three examples of "serious corruption" on the part of public officials that would "typically" justify an honest services conviction. 106 F.3d at 1076. Woodward's failure to report supports the implication that Woodward was aware that these gratuities were improper, especially in light of the fact that "[m]uch of his entertainment ... took place out-of-state—usually at industry and legislative conferences—where members of the Massachusetts citizenry generally would not observe the questionable activities." Sawyer, 85 F.3d at 733. Woodward had every incentive to keep these "questionable activities"

---

8. In United States v. Margiotta, 688 F.2d 108 (2d Cir.1982), the court upheld the conviction for theft of honest services of a defendant who was not even an elected public official (he was the Republican Committee Chairman for Nassau County and for the Town of Hempstead). The defendant's liability was based in part on the grounds that he had a fiduciary duty to the public, and part of that duty was to disclose any personal interest in a matter over which he might have to make a decision, including bribes by interested parties.

secret from the public by not disclosing them on his SFIs. The SFIs are public documents, which are frequently scrutinized by the press and political opponents during election years. In fact, the only gift Woodward ever reported was a local, public golf tournament sponsored by Massachusetts Candy & Tobacco Distributors, Inc., which he reported after learning that the tournament was under investigation by the State Ethics Commission.

■ We agree with the government that Woodward's intentional failure to disclose the Hancock and LIAM gifts in itself provides a solid basis for the jury to find that Woodward had the requisite intent to deprive the public of his honest services. This same evidence also supports the finding that Woodward had the intent to deceive necessary for a mail and wire fraud conviction. *See supra* at 55, n. 6. "[A]n official's intentional violation of the duty to disclose provides the requisite 'deceit.'" *Sawyer*, 85 F.3d at 732 (quoting *Silvano*, 812 F.2d at 760).[9]

Viewing the record in the light most favorable to the verdict, a rational jury could have found the requisite intent from the trial evidence. The evidence was sufficient for a rational juror to find, beyond a reasonable doubt, that Woodward accepted gratuities from Sawyer with the intent to defraud the public of its right to his honest services, and that he had the specific intent to deceive. *See also Sawyer*, 85 F.3d at 742 (finding that the evidence adduced there "would be adequate to infer improper intent").

### C

*Other Elements of Wire Fraud (Count 9)*

■ As noted *supra*, to support a conviction for mail or wire fraud, the government must prove beyond a reasonable doubt: "(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme."

*Sawyer*, 85 F.3d at 723; *see* 18 U.S.C. § 1341, 1343.

Woodward also challenges his convictions based on the second requirement. He argues that the government offered insufficient evidence to prove either that Woodward caused the wiring or that the wiring was "for the purpose of executing [the] scheme" to defraud. *See* 18 U.S.C. § 1343.

The wire fraud count relates to a COIL conference in Orlando, Florida, in November, 1990. The indictment alleged that on November 21, 1990, a call was placed from Boston, Massachusetts, to Lake Buena Vista, Florida, and that its purpose involved "[a]rrangements related to entertainment in Florida."

■ Woodward claims that he did not "cause" this telephone call to be made, and that it was not made for the purpose of executing a scheme for Woodward to defraud the public of its right to his honest services. We disagree on both points. As we stated in *Sawyer*, Woodward "'need not personally use the wires as long as such use was a reasonably foreseeable part of the scheme in which [he] participated.'" 85 F.3d at 723 n. 6 (quoting *United States v. Boots*, 80 F.3d 580, 585 n. 8 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 263, 136 L.Ed.2d 188 (1996)). In addition, "[t]he use of the mails or wires to further the fraudulent scheme need only be 'incidental.'" *Id.* (quoting *United States v. Grandmaison*, 77 F.3d 555, 566 (1st Cir.1996)).

Here, Woodward concedes that the jury could reasonably have inferred from the evidence that Hancock's Functions Coordinator called the Florida hotel on or about November 21, 1990, for the purpose of reserving a room, so Sawyer could attend the COIL conference in Orlando. Nevertheless, Woodward claims that he could not have reasonably foreseen that a Hancock employee would make a room reservation for Sawyer at this COIL conference, nor that she would use the telephone to do so. According to Woodward, Sawyer's "presence [at the con-

---

**9.** In the *Sawyer* case, SFI forms were not available to the government as proof of illegal intent, because, unlike Woodward, Sawyer had no obligation under Mass. Gen. Laws ch. 268B, § 5 to report the gratuities in a publicly filed document that protects against conflicts of interest.

ference] could have been ensured by many means other than the fortuity of an interstate telephone call to reserve his hotel room." We disagree.

Woodward knew full well that Sawyer would need a hotel room in Florida for the COIL conference, and that Sawyer's office was located in Massachusetts. Woodward could reasonably have foreseen that the hotel reservations in Florida would be made by phone either by Sawyer or by someone acting on his behalf. That Sawyer could conceivably have made his room reservation in person or by mail does not undermine the foreseeability of a telephone call. The jury was entitled to use its common sense to infer that a reasonable person would have foreseen a telephonic reservation, as a means commonly employed in the business world for transactions of this type. Thus, the jury was entitled to conclude, based on the evidence presented, that Woodward "caused" the wiring.

■■ Woodward further argues that "the evidence presented was insufficient to show that the purpose of this call was to execute a scheme by Woodward to deprive the public of its right to his honest services by receiving gratuities from Sawyer with the intent to favor unlawfully Hancock's legislative interests." Def. Br. at 27. We disagree. The jury could reasonably have concluded that the call was made in furtherance of the scheme to defraud. Sawyer would not have been able to give Woodward the illegal gratuities during the COIL conference if Sawyer did not have a hotel room in which to stay for the four days of the conference. The call in question secured that room, and thus played an essential role in the scheme.

Our conclusion is buttressed by decisions involving mail fraud, which is analogous to wire fraud for these purposes. The focus of our inquiry on this question "ought to be concerned less with the precise contents of the particular mailings than with the role those mailings played in the execution of the scheme to defraud." *United States v. Serino,* 835 F.2d 924, 928 (1st Cir.1987). In *Silvano,* we upheld a mail fraud conviction of government officials, where the defendants neither placed nor received any of the mail-

ings. (The mailings consisted of the payment of premiums and commissions, all incidental to, but related to, commission of the fraud.) We held that these mailings were sufficiently in furtherance of the fraud. 812 F.2d at 760. We reasoned that "the federal mail fraud statute sweeps broadly and its prohibitions extend to the use of the mails by corrupt local government officials. It is similarly settled that use of the mails need be no more central to the illegal scheme than were the mailings supporting the counts upon which [the defendants] were convicted." *Id.*

The evidence was sufficient to support Woodward's wire fraud conviction.

## D

### *Mail Fraud (Count 4)*

■■ With respect to the mail fraud count, Woodward concedes that, "because the evidence showed he was at events for which Sawyer paid with his credit card, it was reasonably foreseeable to him that Sawyer would be billed by mail for these credit card expenditures on his behalf." Def. Br. at 28. Therefore he does not contest the fact that he "may be said to have 'caused' the mailing alleged in Count 4 when he let Sawyer pick up the tab." *Id.*

But he contends that "the purpose of the mailing strays far from the execution of a scheme by Woodward to defraud the public." *Id.* at 29. He argues that the scheme had already reached fruition by the time the mails were used. He points to *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), where the Supreme Court noted that "Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as *a result of* the fraudulent scheme. But it did not do this; instead, it required that the use of the mail be *'for the purpose of executing* such scheme or artifice.' " *Id.* at 405, 94 S.Ct. 645 (footnote omitted) (emphasis added).

In the present case, the mailing in question was sent by Citibank Visa to Sawyer, billing him for charges arising from Sawyer's use of his Visa card to pay for illegal gratuities given to Woodward. According to Wood-

ward, because the mailing took place some three to four weeks after Sawyer purchased the meals and entertainment for Woodward, the use of the mail was "a result of" the fraudulent scheme but not "for the purpose of executing" the scheme. *Id.* We disagree.

Woodward's argument focuses too narrowly, on each gratuity individually. His contention assumes a new fraudulent scheme began and ended every time Sawyer used his credit card to pick up the tab for Woodward. On the contrary, the evidence supported the conclusion that the fraudulent scheme in which Woodward and Sawyer participated was an ongoing scheme, lasting for years and involving Sawyer's use of his credit card. Every month, Visa would use the mails to bill Sawyer for his charges; if Sawyer did not pay those bills, his credit line would have been terminated and the gratuities could not have continued as Woodward and Sawyer expected. It was thus a necessary part of the ongoing scheme that Sawyer pay his bill after receiving it in the mail. *See Sawyer*, 85 F.3d at 730 ("[A] person with continuing and long-term interests before an official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services.") This case is therefore distinguishable from *Maze*, where the mailing involved only a post-fraud accounting among victims, after the defendant's fraudulent use of credit cards was already completed. *See Maze*, 414 U.S. at 402, 94 S.Ct. 645; *Schmuck v. United States*, 489 U.S. 705, 714, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (distinguishing and limiting *Maze* to cases in which the fraudulent scheme has come to fruition).[10]

Woodward cursorily argues that the wiring and mailing are merely "a pretext to manufacture federal jurisdiction over a local offense." Def. Br. at 30 (mail fraud); *see id.* at 28 (wire fraud). We have already rejected such a federalism claim: "Congress may protect the integrity of the interstate mails and wires by forbidding their use in furtherance of schemes to defraud a state and its citizens, whether or not it can forbid the scheme itself." *Sawyer*, 85 F.3d at 722–23 (citations omitted).

The evidence was sufficient to support the mail fraud conviction.

### E

### *Travel Act (Count 14)*

The elements of a Travel Act violation include: (1) interstate travel or the use of an interstate facility; (2) with the intent to promote, manage, establish, carry on, or facilitate an unlawful activity (here, violation of the Massachusetts gratuity statute, Mass. Gen. Laws ch. 268A, § 3 (West 1990)); and (3) followed by performance or attempted performance of acts in furtherance of the unlawful activity. *See* 18 U.S.C. § 1952; *United States v. Arruda*, 715 F.2d 671, 681 (1st Cir.1983).

Woodward argues that the evidence supporting the Travel Act conviction was deficient in four respects. First, he argues that the evidence was insufficient to establish the requisite criminal intent to violate 18 U.S.C. § 1952. We disagree, for the same reasons discussed in Part III(B), *supra*, in relation to his intent under the mail and wire fraud statutes. *See Sawyer*, 85 F.3d at 741 (equating intent requirements of mail and wire fraud statutes with that required under Travel Act).

---

10. Woodward also points to *United States v. Cross*, 128 F.3d 145 (3d Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1519, 140 L.Ed.2d 672 (1998), but that case is also distinguishable. In *Cross*, the defendants had conspired to fix the outcomes of various judicial proceedings, and the mailings alleged as the basis for the mail fraud conviction were simply the official notices sent by the court to notify the parties of the outcomes of their cases. The court held that such "legally required mailings ... cannot be deemed to have been made 'for the purpose of executing' a fraudulent scheme." *Id.* at 152; *see also id.* at 152 n. 4 (distinguishing *Schmuck*, 489 U.S. at 713 n. 7, 109 S.Ct. 1443, where the mailings "were a direct result of and would not have occurred but for the fraudulent scheme"). In the present case, Sawyer's Visa bills were certainly not "legally required mailings" that simply informed people of the already completed outcome of the scheme. Nor would those Visa bills have been mailed "but for the fraudulent scheme." *Cross*, 128 F.3d at 152 n. 4.

Second, Woodward maintains that, in order to prove a violation of the Travel Act, the government had to prove that Woodward violated the bribery laws of Florida. The Travel Act punishes traveling in interstate commerce for the purpose of carrying on any unlawful activity; such activity encompasses the commission of bribery "in violation of the laws of the state in which committed or of the United States." 18 U.S.C. § 1952(b)(2). The indictment incorporates the Massachusetts gratuity statute, Mass. Gen. Laws ch. 268A, § 3, as the underlying bribery offense. Woodward contends that the bribery, if any, took place only in Florida, and therefore, without evidence of any Florida bribery statute, the Travel Act conviction must be reversed. This argument is unavailing.

The Travel Act "does not require the government to prove that the alleged 'unlawful activity' violates the laws of the state ultimately traveled to," or of the state where money actually changed hands. *United States v. Walsh,* 700 F.2d 846, 854–55 (2d Cir.1983) (mayor of city in New Jersey agreed in New Jersey to accept bribe and traveled to New York to collect it); *see United States v. Jones,* 642 F.2d 909, 913 (5th Cir.1981). A conviction may be sustained where the evidence demonstrates "unlawful activity" in violation of the laws of the state where the effects of the fraudulent scheme are felt, in this case, the state whose citizens are defrauded of their legislator's honest services. *See Walsh,* 700 F.2d at 854–55. Here, Woodward is a legislator from Massachusetts, and the jury could have concluded that the gratuity, though paid in Florida, was paid for the purpose of influencing legislative activities in and affecting Massachusetts. As we discuss below, that is sufficient.

Woodward's third challenge to his Travel Act conviction involves timing. He asserts that there was no evidence that Woodward performed any acts in furtherance of the unlawful activity *after* the interstate travel on November 24, 1990, as alleged in the indictment. Woodward notes that, although the Travel Act requires such, the Massachusetts gratuity statute does not *require* any *subsequent* activity to be taken in Massachusetts after the Florida bribe. As evidence of Woodward's post-gratuity activity, the government points to Woodward's action with respect to S. 641, which proposed premium reductions in life insurance for policyholders who were non-smokers. The bill was originally reported favorably out of the Insurance Committee on May 7, 1990. Then on July 24, 1990, just before becoming law, the House of Representatives recommitted the bill to the Insurance Committee. The effect of a bill's recommittal is that both chairs would have to act in order for the bill to be released. The bill languished in the Insurance Committee with no further action taken through January 1, 1991, after Woodward received the Florida gratuities and prior to his removal as co-chair. Woodward's co-chair, Senator Melconian, had actively supported the 1989 bill by requesting a favorable recommendation from the Insurance Committee. The jury could, therefore, reasonably have inferred that Woodward prevented any further action on S. 641, because in the previous year he led the floor debate, on behalf of Hancock and LIAM, against a similar non-smokers bill.

Woodward's receipt of the gratuities in Florida and the subsequent recommittal of S. 641 through January 1991 provided sufficient evidence to allow the jury to find that Woodward performed an act in furtherance of the unlawful activity after the travel to Florida on November 24, 1990. *Arruda,* 715 F.2d at 682. Woodward's timing argument thus fails.

Woodward's fourth argument against his Travel Act conviction is that "the payment of the 'bribe' in Florida" has such an "attenuated relationship to Massachusetts" that it would violate the "effects doctrine." Def. Br. at 32. "Under this doctrine, a sovereign only possesses jurisdiction to prosecute a crime where, inter alia, 'the effect within the territory is substantial.'"[11]

---

11. The "effects doctrine" originated in international law, where it held that a country may regulate conduct occurring outside its territory which causes harmful results within its territory. *See, e.g., Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911); *United States*

*Id.* (quoting *Commonwealth v. Beneficial Fin. Co.,* 360 Mass. 188, 275 N.E.2d 33, 57 n. 8 (1971)). Because acts that might otherwise be "gratuities" could be performed out-of-state without any corresponding "effect" in Massachusetts, Woodward maintains that Massachusetts would lack jurisdiction to prosecute purely out-of-state expenditures. Def. Br. at 32 (citing *Heath v. Jones,* 941 F.2d 1126, 1139 (11th Cir.1991) (no due process violation when state prosecutes crime that started within its borders and concluded in another state); *Commonwealth v. Levin,* 11 Mass.App.Ct. 482, 417 N.E.2d 440, 451 (1981) (state may prosecute acts performed outside of its jurisdiction where acts are intended to produce and *actually produce* detrimental effects within the state)).

Woodward asserts that the government failed to produce any evidence of detrimental effect actually resulting from the out-of-state expenditures; the "mere possibility of future action favorable to Hancock is not an 'effect,' let alone one that is 'substantial.' Nor would alteration of official acts be the 'direct' or 'foreseeable' result of lobbyists entertaining legislators at out-of-state conferences." Def. Br. at 33 (citing *Sawyer,* 85 F.3d at 741). We disagree.

The Massachusetts gratuity statute prohibits public employees from receiving "anything of substantial value ... for or because of any official act ... performed or to be performed by him." Mass. Gen. Laws ch. 268A, § 3. "The concern behind the gratuity statute, like the bribery statute, is the *potential* undermining of official integrity." *Saw-*

*yer,* 85 F.3d at 735 (emphasis added). Indeed, when someone gives a stream of illegal gratuities to a public official, a sense of being beholden to the giver's interests is exactly the kind of influence that the giver is trying to develop. *See id.* at 730. The potential effect on Massachusetts when one of its own legislators accepts gratuities out-of-state paid by someone with an interest in Massachusetts legislation is a sufficient nexus to satisfy the effects test and give Massachusetts jurisdiction to prohibit such conduct.

■ Besides this potential effect, of course, Woodward's receipt of gratuities in Florida was linked also to his official acts in Massachusetts. Among these acts is his recommittal of a particular bill, Senate Bill 641 (S.641), shortly after he returned from Florida, as already discussed. And they also included his prior acts to champion the insurance industry's positions in the Legislature.[12] Woodward violated the Massachusetts gratuity statute, a prerequisite for his Travel Act violation, because he received something of "substantial value ... for or because of any official act ... performed or to be performed by him." Mass. Gen. Laws ch. 268A, § 3. We have already discussed our view that the evidence was sufficient to establish the linkage beyond a reasonable doubt.

Woodward's Florida gratuity was closely enough related to Massachusetts that his "effects doctrine" argument must fail. *See Strassheim,* 221 U.S. at 284–85, 31 S.Ct. 558 (holding that, when an individual's criminal acts were intended to and did produce detrimental effects within a state, the state may

*v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945). Under the territorial effects doctrine, jurisdiction exists only when significant effects were intended within the prescribing territory. *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 923 (D.C.Cir.1984); *Aluminum Co. of America,* 148 F.2d at 444. This jurisdictional concept of international law has been applied to jurisdiction by one state over criminal activities of out-of-state entities which affect the forum state. *See Beneficial Fin. Co.,* 275 N.E.2d at 57 n. 8; *cf. FTC v. Compagnie de Saint–GobainPont–a–Mousson,* 636 F.2d 1300, 1317 n. 93 (D.C.Cir.1980). The effects doctrine has also been applied in determining whether a forum state's courts may exercise personal jurisdiction over a non-resident defendant, via the forum's long-arm statute, without violating the due process clause of the Fourteenth Amend-

ment. *See Calder v. Jones,* 465 U.S. 783, 788–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *but see Resolution Trust Corp. v. First of America Bank,* 796 F.Supp. 1333, 1337–38 (C.D.Cal.1992) (refusing to extend the effects doctrine from the field of intentional torts to a contract claim).

12. For these prior acts, the gratuity was a reward, which is cognizable under the Massachusetts Gratuities Act even though it is not a violation of federal law.

We note that, in order to violate the Travel Act, a gratuity need not be motivated by a "specifically identified official act." *Sawyer,* 85 F.3d at 735–38.

prosecute that individual even if he commits the act in another jurisdiction; applying this rule to an attempt to bribe a Michigan official who was in charge of making state purchases, even though defendant never entered Michigan); *Heath*, 941 F.2d at 1138–39. As the district court noted, to hold otherwise would "be at odds with the idea of official bribery or corruption.... [It would] provide a series of safe havens for those who wish to be bribed or [to be] the recipients of gratuities. [It would be] at odds with the statute itself [and] with the larger purposes of the Travel Act."

## F

### Conspiracy (Count 1)

 In order to convict Woodward of conspiracy, the government had to prove that a conspiracy existed, that Woodward knew of and voluntarily participated in it, and that an overt act took place in furtherance of it. *See United States v. Frankhauser*, 80 F.3d 641, 653 (1st Cir.1996). The agreement need not be explicit; a tacit agreement will suffice. *See id.; Direct Sales Co. v. United States*, 319 U.S. 703, 712–13, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). To establish Woodward's voluntary participation in the conspiracy, the evidence must establish both his intent to agree and his intent to effectuate the object of the conspiracy. *Frankhauser*, 80 F.3d at 653; *see also United States v. Piper*, 35 F.3d 611, 615 (1st Cir.1994). Neither the agreement nor Woodward's participation in it need be proven with direct evidence. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457,

86 L.Ed. 680 (1942); *Frankhauser*, 80 F.3d at 653.

Woodward's challenge to his conspiracy conviction is that it depends on the three substantive counts on which he was convicted, and he maintains that those counts suffered from sufficiency of the evidence infirmities that compel acquittal. "Because these infirmities extend to the conspiracy count," he argues, "Count 1 must fall for the same reasons as the three substantive counts of which it is comprised." Def. Br. at 34.

Woodward's argument is unavailing, because we have concluded that none of the three substantive counts comprising the conspiracy count was infirm. Therefore, the evidence is sufficient to support the conspiracy conviction for the same reasons discussed *supra* concerning the substantive counts, and Woodward's conspiracy conviction must stand.[13]

Based on the evidence in this record, we conclude that a reasonable jury could have found, beyond a reasonable doubt, that Woodward committed all elements of the four offenses of which he was convicted.

## IV

### Jury Instructions

 Woodward contends that the district court erred in instructing the jury as to the intent necessary to support a conviction, contrary to our decision in *Sawyer*. Such a challenge to the jury instructions presents legal issues which we review *de novo*.[14] *United States v. Phath*, 144 F.3d 146, 148–49

---

**13.** As we found in *Sawyer*, regarding the conspiracy alleged between Sawyer and his supervisor at Hancock (who obviously was further removed from the alleged deprivation of honest services than Woodward is), the jury could reasonably infer that both men "knew that the expenditures were unlawful, and *from this*, that the reason for the repeated illegal gifts and gratuities to key legislators was to secretly influence legislative action." 85 F.3d at 743. Given the evidence of repeated expenditures, "a jury could rationally find that [the defendant and his co-conspirators] agreed, at least tacitly, to the pattern of unlawful conduct. Finally, the jury could also infer that [the defendant and his co-conspirators] knew that the mails and wires would be used to facilitate the entertainment ... (e.g., the mailing of bills related to, and the making of telephone calls

to arrange, the entertainment), and that interstate travel in connection with the entertainment (e.g., [expenditures for] out-of-state golf) would or had to occur." *Id.* Among the overt acts, we found the evidence sufficient to establish "Sawyer's giving of illegal gratuities" to, among others, Woodward. *Id.*

**14.** The standard of review here, as in many situations, depends on the nature of the issue being presented. There are other cases involving jury instructions (for example, where the challenge is to the form or wording of the jury instructions) where the district court usually has more latitude and the proper standard of review is for abuse of discretion. *See, e.g., United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.1984).

(1st Cir. May 20, 1998); *United States v. Pitrone*, 115 F.3d 1, 4 (1st Cir.1997) (When the alleged error involves the instructions' adequacy in explaining the law, such as "interpretation of the elements of a statutory offense, it poses a question of law and sparks plenary review."); *United States v. Fulmer*, 108 F.3d 1486, 1494 (1st Cir.1997). We must look at the entire charge, in light of the evidence, and determine whether, taken as a whole, the court's instructions "fairly and adequately submit[ted] the issues in the case to the jury," *United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir.1993) (internal quotation marks omitted), or whether they "tended to confuse or mislead the jury" as to the applicable principles of law, *Sawyer*, 85 F.3d at 726 (internal quotation marks omitted); *see Fulmer*, 108 F.3d at 1494.

■■■■ The district court is not obligated to "follow the exact form and wording of the defendant's proposed instructions." *United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.1984); *Lawrence v. Gulf Oil Corp.*, 375 F.2d 427, 429 (3d Cir.1967). Rather, "[t]he trial court has considerable latitude in charging the jury," so long as the charge as a whole fairly and adequately limns the law applicable to the controlling issues. *Cassiere*, 4 F.3d at 1022 (internal quotation marks omitted). That latitude is not unlimited,

however. Clear, accurate, easily understood jury instructions are "vitally important in assuring that jurors grasp subtle or highly nuanced legal concepts." *United States v. DeStefano*, 59 F.3d 1, 4 (1st Cir.1995). In *Sawyer*, in order to protect a defendant from being convicted based on conduct that was not actually illegal, we reversed the conviction and mandated a protective instruction in cases such as this one.

■■■ In the present case, Woodward challenges the district court's instruction on the issue that the court and the parties referred to as the issue of "mixed motive." [15] Proof of motive is not an element of the offenses. The phrase "mixed motive" was apparently meant as shorthand for the dual intent that might be supportable by the evidence in this case: the jury could have concluded (1) that Woodward accepted expenditures based on his legitimate friendship with Sawyer, or (2) that these were unlawful expenditures to influence official action (or some combination of the two).

Woodward argues that our decision in *Sawyer* intended to draw a bright line between "the merely unattractive and actual criminal conduct." *Sawyer*, 85 F.3d at 741. On one side of the line, according to Woodward, is conduct that is "unattractive" or even "reprehensible" but is not illegal as a

---

**15.** We note that the district court's instruction on reasonable doubt was questionable. It stated: "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things, of course, in this world that we know with absolute certainty. And in criminal cases, the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty."

Woodward has not appealed this portion of the jury instructions, so plain error review is appropriate. *See Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 1544, 1547, 137 L.Ed.2d 718 (1997); Fed.R.Crim.P. 52(b). The district court's instruction survives the high hurdle of plain error review, *see Pitrone*, 115 F.3d at 4–5, notably because the court gave significant emphasis to the presumption of innocence.

Nevertheless, we have previously joined other circuits in criticizing the Federal Judicial Center instruction from which the district court's "firmly convinced" language is drawn. *See United States v. Gibson*, 726 F.2d 869–874 (1st Cir.), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984), pointing out that "reasonable doubt" definitions have a tendency to provoke unnecessary litigation. *Id.* at 874. We have expressed particular concern that "many definitions reduce the burden of proof on the government by expanding the degree of doubt permissible, and consequently such definitions result in increased appellate litigation." *United States v. Andujar*, 49 F.3d 16, 23 (1st Cir.1995) (internal quotation marks and alteration omitted). We note that for district courts in this circuit that are inclined to provide further definition for the concept, a reasonably detailed reasonable doubt instruction used by Judge Keeton is set forth verbatim, and expressly approved without qualification, in *United States v. Cleveland*, 106 F.3d 1056, 1062–63 (1st Cir.1997), *aff'd on other grounds, sub nom., Muscarello v. United States*, —— U.S. ——, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998).

matter of federal criminal law. This would include lavish hospitality if intended to cultivate business or political relationships or friendships. On the other side of the line is illegal expenditures, i.e., those by lobbyists intended "to cause the recipient to alter her official acts." *Id.* According to Woodward, *Sawyer* presented this analysis "largely in stark 'either-or' terms." Def. Br. at 35. He claims to have premised "the core" of his defense on this "bright line" distinction, attempting to persuade the jury that Woodward and Sawyer's relationship should be found "to fall on the 'friendship' side of the line," because of the family friendship and the social nature of the functions at which the expenditures were made. *Id.* at 38.

Woodward's theory of the case is flawed, based on a misreading of our decision in *Sawyer*. Relationships among human beings, especially among lobbyists and elected officials, will frequently not follow a bright-line pattern, falling on one side or the other of some magical wall dividing friendship from attempts at undue influence. A lobbyist and legislator may initially have an exclusively business relationship when they first meet, but if it continues over time, given the nature of the lobbying business with its sometimes "lavish hospitality," *Sawyer*, 85 F.3d at 741, the individuals involved may eventually get to know each other, and some may be able to claim, with some truth, that their relationship has become one of friendship. We did not imply anything different in *Sawyer*,[16] and we certainly did not state or imply what Woodward's theory seems to entail: that the formation of a friendship between a lobbyist and a legislator somehow insulates both from prosecution for honest services fraud.

A look at *Sawyer*'s language illustrates Woodward's error. We stated: "[I]f the aim of the lobbyist were *simply* to cultivate a business or political 'friendship' with the legislator," then payments for entertainment would not constitute a violation of the Travel Act or the mail or wire fraud statutes. 85 F.3d at 741 (emphasis added). To so hold—

that conduct is not illegal if it is "simply" to cultivate a friendship—does not immunize dual intent conduct. The word "simply" carries the import of "solely." A dual intent that seeks *both* to cultivate friendship *and* to illegally influence official acts is not a purpose that is "simply" to promote friendship. Such a dual purpose is not insulated from criminal liability merely because, in *Sawyer,* we were careful to protect a purpose that is "simply" to promote friendship.

Similarly, in *Sawyer* we said: "[I]f Sawyer had this *limited intent*—to cultivate friendship *rather than* to influence an official act— the federal statutes here involved would not be violated." *Id.* (emphasis added). An intent "limited" to promoting friendship does not include an intent that also has a second purpose. The words "rather than"—when juxtaposed in this way against the "limited intent" language—imply that an intent to influence cannot be part of one's intent if one seeks the *Sawyer* immunity.

After discussing an intent limited to the cultivation of business or friendship, *Sawyer* went on to say that: "Only if instead *or in addition*, there is an intent to cause the recipient to alter her official acts may the jury find a theft of honest services or the bribery predicate of the Travel Act." *Id.* at 741 (emphasis added). Woodward's argument addresses the "instead" portion of the disjunctive, but Woodward offers no basis for reading the highlighted words out of our holding in *Sawyer.* The quoted sentence clearly contemplates, not a "bright line" or "either-or" dichotomy (Def. Br. at 37–38), but the possibility that a defendant may be prosecuted if he possesses a dual intent, an illegal intent "in addition" to a legal "friendship" intent.

■ Thus, *Sawyer*'s language does not mean what Woodward would like it to mean—that conduct must have an *exclusively illegal* intent in order to be subject to the criminal laws. Rather, it means only that

---

16. Woodward points to our language in *Sawyer* requiring the district court to "take pains to explain" to the jury the difference between "the merely unattractive and actually criminal conduct." 85 F.3d at 741. But to explain the differ-

ence is not the same as to create a bright line test such that a defendant is insulated from criminal liability merely because a legal friendship forms a portion of his intent.

conduct may not be subject to the criminal laws if the intent underlying it is *exclusively legal.* A defendant may be prosecuted for deprivation of honest services if he has a dual intent, i.e., if he is found to have intended both a lawful and an unlawful purpose to some degree. If the jury finds that an unlawful purpose was present, it may convict the defendant.

The Third Circuit reached a similar conclusion in *United States v. Greber*, 760 F.2d 68, 72 (3d Cir.1985). As Woodward noted, the jury in *Greber* "was instructed similarly to the present case, making *any* amount of inducement, however small, illegal." Def. Br. at 39 n. 27; *see Greber*, 760 F.2d at 72. In *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20 (1st Cir.1989), we noted that we were "impressed with the Third Circuit's reasoning" in *Greber. Bay State*, 874 F.2d at 29–30. Likewise, the Second Circuit has "noted that there could be dual purposes for payments, stating that a 'valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability.' The charge was entirely appropriate in light of [the defendant's] argument that he was motivated by friendship." *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir.1993) (rejecting challenge to jury instruction that defendant must be found to have accepted or solicited a thing of value "at least in part" for or because of his intent to be influenced) (citing *Biaggi*, 909 F.2d at 683); *see also Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (conspiracy).

■ Therefore, the answer to Woodward's assertion that "[t]he district court's instruction should ... have parroted *Sawyer*," Def. Br. at 38, is that, for all relevant purposes, it did. The district court instructed the jury, inter alia, as follows:

> You may not find that the defendant violated either set of federal laws which I have described to you if his receipt of the expenditures was solely part of a routine cultiva-

tion of a business or political friendship rather than an intent on his part to be influenced in his official legislative duties. If instead or in addition, there is an intent on the defendant's part to be influenced in his official legislative duties, then you may find a violation of either set of federal laws. If there is both the intent to cultivate a business and political relationship and the intent to be influenced in official legislative duties, then you may find a violation of the federal laws.

Woodward would have us go beyond *Sawyer* in the present case. He insists that the real issue here is the *degree* of unlawful intent necessary[17] in a dual intent case to permit or sustain a conviction, and the necessary jury charge on that point. Woodward argues that the protective instruction we set forth in *Sawyer* should be modified to say that an illegal purpose must be at least "one of the [scheme's] several *dominant* purposes," Def. Br. at 40 (quoting *United States v. Ellis*, 935 F.2d 385 (1st Cir.1991) (Mann Act)) (emphasis added). Otherwise, under our reading of *Sawyer*, a *de minimus* illegal intent could result in a conviction even if it were dwarfed by a perfectly legal "friendship" intent.

■ According to Woodward, the illegal purpose of the gratuity should not be a minor or incidental portion of the mix. We disagree. The criminal law may punish conduct even if its illegal purpose is incidental to other, legal purposes. *See Anderson*, 417 U.S. at 226, 94 S.Ct. 2253 (holding that the purpose to violate federal law may be a secondary purpose, not necessarily primary); *United States v. Ellis*, 595 F.2d 154, 162 (3d Cir.1979) ("While [Supreme Court cases] require such a specific intent [to violate constitutional rights], they do not require that the immediate intent to violate constitutional rights predominate over the ultimate purposes which that violation is designed to achieve.").

■ We will assume nevertheless that Woodward is correct that a conviction should

---

17. Woodward does not indicate whether the basis of his contention is some constitutional provision, is rooted in the language of the statute itself, or has some other source. Because Woodward states no basis for this "necessity" other than the implication that arises from his argument that *Sawyer* requires it, we address only the *Sawyer* issue.

not stand if the illegal intent is *de minimus* or insignificant. But this does not mean that the district court erred in failing to give an instruction as to the *"de minimus"* point. The law may require a certain degree of illegal intent in order to convict, but it does not follow that an explicit instruction on that point is necessary. In the present case, even if the instructions were not technically adequate because they lacked an explicit *"de minimus"* instruction, Woodward was not prejudiced thereby. "An error in jury instructions will warrant reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." [18] *Davet v. Maccarone*, 973 F.2d 22, 26 (1st Cir.1992). As we have already discussed in Part III, there is no evidentiary basis in this record for Woodward's implicit contention that he had no more than a *de minimus* degree of intent to defraud the public of his honest services. Therefore the omission of explicit *"de minimus"* language from the jury instructions—even if erroneous—did not prejudice Woodward, and any error does not warrant reversal of his conviction. *See Davet*, 973 F.2d at 26.

## V

### *Super Bowl Evidence*

■ Woodward appeals the denial of his motion in limine to exclude evidence that Hancock, through Sawyer, paid for a 1986 trip for Woodward and his wife to the Super Bowl in New Orleans. The court permitted the government to introduce evidence concerning the Woodwards' receipt of $1,809 worth of airfare, lodging, and tickets to the game. After admitting such evidence, the court gave a limiting instruction to the jury.

Woodward objects that this particular gratuity involved more money and was different in kind than the gratuities on the basis of which he was convicted: it included payment for airfare and lodging, whereas all other gratuities were limited to meals, golf, and other forms of entertainment. He also points out that the statute of limitations precludes Woodward from being charged with crimes committed prior to July 27, 1990, and that 18 U.S.C. § 1346 was not even enacted until November 18, 1988. For these reasons, Woodward claims that the admission of the Super Bowl evidence was of limited probative value, and that whatever probative value it did have was substantially outweighed by the danger of unfair prejudice. He argues that it should have been excluded under Fed. R.Evid. 403.

■ Under Rule 403, "if the evidence brings unwanted baggage, say, unfair prejudice or a cognizable risk of confusing the jury, and if the baggage's weight substantially overbalances any probative value, then the evidence must be excluded." *United States v. Aguilar–Aranceta*, 58 F.3d 796, 800 (1st Cir.1995) (internal quotation marks omitted). "The damage done to the defense is not a basis for exclusion; the question under Rule 403 is one of unfair prejudice—not of prejudice alone." *United States v. Munoz*, 36 F.3d 1229, 1233 (1st Cir.1994) (internal quotation marks omitted). We review trial court rulings under Rule 403 for abuse of discretion. *See United States v. Fulmer*, 108 F.3d 1486, 1497 (1st Cir.1997); *Aguilar–Aranceta*, 58 F.3d at 800.

■ We note first that, while Woodward is concerned that this particularly expensive gratuity might prejudice the jury because of its amount, he neglects to mention the coincidence in the timing: the Super Bowl took place shortly after Woodward became chair of the Insurance Committee,[19] which happened to be a position from which he could potentially be of great use to Sawyer and Hancock. The government argues, with some force, that the Super Bowl gratuity, elaborate as it was, established and set the tone for the ongoing relationship, i.e., a conspiracy to trade valuable gifts for influence,

---

**18.** Of course, it is reversible error for a trial judge to fail to instruct the jury on every element of the offense necessary for conviction. *United States v. DiRico*, 78 F.3d 732, 735 (1st Cir.1996) (citing *United States v. Gaudin*, 515 U.S. 506, 522–23, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)).

**19.** This places it within the time limits of the conspiracy as alleged by the government.

to deprive Woodward's constituents of his honest services. Once the nature of the relationship was established, ongoing gifts could be given in smaller amounts in order to "keep the wheels greased." Thus, the Super Bowl evidence has a good deal more probative value than Woodward suggests. And its prejudicial effect is far less: accepting tickets to the Super Bowl is not so heinous or outrageous that the jury was likely to be inflamed against Woodward and ignore the arguments presented in his defense,[20] thereby risking a conviction based on passion rather than on the evidence. *Cf. United States v. Bartelho,* 129 F.3d 663, 677–78 (1st Cir.1997) (affirming admission of plans to escape from prison at trial on bank robbery); *Pitrone,* 115 F.3d at 7–8 (admitting evidence of defendant's boasting about 40 prior commissions of the same crime); *United States v. Rivera,* 83 F.3d 542, 545–47 (1st Cir.1996) (evidence that defendant raped victim admissible at trial on carjacking charge); *United States v. Manning,* 79 F.3d 212, 217–18 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 147, 136 L.Ed.2d 93 (1996) (admitting evidence of prior drug dealing at trial on current drug trafficking charges); *United States v. Cruz–Kuilan,* 75 F.3d 59, 61 (1st Cir.1996) (affirming admission of evidence that victim died of gunshot wounds at trial for carjacking); *United States v. Lombard,* 72 F.3d 170, 190 (1st Cir.1995) (evidence relating to murder, of which defendant had previously been acquitted, admitted at trial on firearms violations).

In *Sawyer,* we noted the district court's decision to admit the same Super Bowl evidence to prove "Sawyer's state of mind with respect to the alleged scheme to defraud." 85 F.3d at 721 n. 1. We observed that the court had instructed the jury, as the district court did here, that these events took place prior to the time indictable under the statute of limitations, but that such evidence was probative of the defendant's (there, Sawyer's) state of mind. In *Sawyer,* we did not address the propriety of admitting this evidence because Sawyer had not challenged it as Woodward has here. In this case, we hold that the district court properly admitted this

evidence, to prove Woodward's intent and the nature of the conspiracy.

## VI

### *Conclusion*

In this case, the jury instructions adequately conveyed to the jury the difference between conduct that is legal and conduct that violates the criminal laws. The evidence was sufficient to enable a rational jury to conclude beyond a reasonable doubt that Woodward was guilty of the four counts on which he was convicted, and no ground for error has been found. The judgment of the district court is *affirmed.*

---

**20.** Woodward's argument assumes the jury will also ignore the court's limiting instruction. We, of course, ordinarily presume the jury follows the court's instructions.