# United States Court of Appeals
## For the First Circuit

Nos. 11-1042 & 11-1043

UNITED STATES OF AMERICA,

Appellee,

v.

TODD DENSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Howard, and Thompson,
Circuit Judges.

James M. Falvey, by appointment of the court, with whom Law
Office of James Falvey was on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty, II, United States Attorney, was on brief, for
appellee.

August 2, 2012

**THOMPSON**, <u>Circuit Judge</u>.

**WHAT THIS CASE IS ABOUT**

Todd Denson spent about a year in federal prison for mail and wire fraud after he got caught up in one of those notorious "Nigerian" money "scams," as law enforcement calls them. <u>See</u> 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud). The short version of what happened is this.

Apparently persons in Africa emailed Denson saying that he (Denson) had inherited the rights to an overseas company worth $9-plus million. They also said that there was a pile of cash in a Barclays Bank account in London just waiting there for him. All he had to do was send over a few thousand dollars to take care of taxes, wire-transfer fees, and the like, and he would be a very rich man.

Deals that look too good to be true often are, and this one certainly was. Calling a local Secret Service office (in addition to protecting some elected leaders, the Secret Service also investigates certain financial crimes, <u>see</u> 18 U.S.C. § 3056), Denson had an agent tell him point blank that this was a scam and that he should not send a dime overseas because, if he did, he would "never see that money again." Importantly, the agent also added that, "now that I've told you that this is a scam," if you "solicit[] money from others" to send abroad, you "<u>could</u>" be on the hook "criminally" for that. (Emphasis added.)

-2-

Pouncing on the fact that the agent had said "could" rather than "would," Denson went ahead and did what he was told not to do, taking tens of thousands of dollars from persons who had trusted him. Convinced (probably rightly) that no one would hand him money if he mentioned the email, Denson had said things like he needed their cash to help with some "window-washing invention" he had "a patent for." Naturally, he dangled the prospect of a big payback to hook the unsuspecting.

At some point Denson called up the agent again and freely admitted that he had "deceived" others into giving him money. Meeting with some agents two days later, Denson copped to a lot more. To deflect suspicion away from what he was doing, he and his foreign-based attorney, Paul Jones, had created a fictitious company to make it look like he had really earned the $9-plus million, Denson said. A Barclays Bank official, he added, had told him that Jones was "a Nigerian scammer," that there was no money waiting there for him, and that the email thing "was a scam." At a follow-up meeting, agents again stressed that all of this "was a scam." Denson replied that he was done with the scheme because he too had "realized" that "it was a scam." He said the same thing a week later, but this time agents confronted him with proof that he had tried to get an undercover agent to "invest" $30,000 in an overseas-construction venture. As part of his pitch, Denson had handed the undercover agent false documents showing that he

(Denson) had sold over $4 million in construction equipment. Essentially caught red handed, Denson fessed up to what he had done, saying it "was wrong."

We could go on and on, but this is enough for now to show why Denson ended up doing a year (give or take) behind bars. Incredibly, once out on supervised release, he returned to his old ways, hustling a bunch of people out of thousands of dollars by saying (among other lies) that he had made a killing in the overseas stock markets or had millions sitting in a Scottish bank but that he needed their money – which he would pay back, and then some – to get what he said was rightfully his.[1] Denson got caught, again. And his actions culminated in a jury's convicting him on multiple wire-fraud counts and a district judge's revoking his supervised release.[2] As for how sentencing went, what matters for our purposes is that the judge imposed concurrent 30-month prison

---

[1] We highlight this vignette so the reader has a full picture of the lengths Denson went to fleece the innocent after his release:  Responding to a Craigslist ad placed by a couple looking for private financing to buy a house, Denson (who at first claimed that his name was "Tim Brashner") said that he would happily loan them the $185,000 that they needed if they would give him $5,000 up front so that he could get a London bank to release his millions. The couple agreed, depositing the money into an account that Denson had selected – money that eventually went to London.  Needless to say, the couple never received any money from Denson.

[2] Denson violated his supervised release by (a) committing wire fraud, (b) neglecting to file truthful and complete monthly reports with probation, and (c) failing to disclose financial gains (like lottery winnings, income-tax refunds, etc.) and to apply them to court-ordered obligations.

terms for each wire-fraud conviction – a sentence within the 24-30 month advisory guidelines sentencing range. After holding a revocation hearing later that same day, the judge also sentenced him to a total imprisonment term of 15 months for the supervised-release violations – even though the sentencing range was 4-10 months. And the judge made the 30-month term run consecutively with the 15-month term.[3]

Which brings us to Denson's appeal. His arguments for reversal fall into two general categories – protests about the jury instructions and criticisms about the sentencing. We explain below why all of his arguments fail, adding more information as we move along.

**JURY INSTRUCTIONS**

The parties – who agree on little else – agree that the elements of wire fraud are a "scheme to defraud," the accused's

---

[3] For those uninitiated into the modern world of federal sentencing, we offer this primer: when fashioning a sentence under the current guidelines system, a judge
   "ordinarily . . . begin[s] by calculating the applicable guideline sentencing range; then determine[s] whether or not any departures are in order; then mull[s] the factors delineated in 18 U.S.C. § 3553(a) as well as any other relevant considerations; and, finally, determine[s] what sentence, whether within, above, or below the guideline sentencing range, appears appropriate."
United States v. Dávila-González, 595 F.3d 42, 46 (1st Cir. 2010) (quoting United States v. Pelletier, 469 F.3d 194, 203 (1st Cir. 2006)). We need not get into the nitty-gritty of what the judge did here. Denson only complains about certain aspects of the judge's § 3553(a) analysis, and we can and will save the details of that for later.

"knowing and willful participation in the scheme with the intent to defraud," and the use of interstate or foreign "wire communications" to further that scheme. See United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993). The judge instructed the jury to that effect. Critically for our purposes, the judge gave a willful-blindness instruction too – i.e., an instruction that (broadly speaking) allowed the jury to infer that Denson had acted knowingly if he had deliberately closed his eyes to obvious facts. See, e.g., United States v. De Jesús-Viera, 655 F.3d 52, 59 (1st Cir. 2011), cert. denied, 132 S. Ct. 1045 (2012). Then the judge also told the jury that Denson's "good faith" was a complete defense to the charges against him.[4]

---

[4] Here are the two instructions in full:
    Now, in deciding whether the defendant acted knowingly, you may infer that the defendant had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise would have been obvious to him. In order to infer knowledge, you must find that two things have been established: First, that the defendant was aware of a high probability of the fact in question; second, that the defendant consciously and deliberately avoided learning of that fact, that is to say, the defendant willfully made himself blind to that fact. It's entirely up to you to decide whether he deliberately closed his eyes to the fact and, if so, what inference, if any, should be drawn. However, it is important to bear in mind that mere negligence or mistake in failing to learn the fact is not sufficient. There must be a deliberate effort to remain ignorant of the fact.
    An act or failure to act is willful if done voluntarily and intentionally and with the specific intent to do something that the law forbids or with a specific intent to fail to do something the law requires to be done, that is to say, with bad purpose either to disobey or to disregard the law. Thus, if the defendant

-6-

Denson complains that the willful-blindness instruction likely confused the jury into thinking that it could convict based on what a reasonable person in his shoes should have known rather than on what he actually believed or intended.  He is right about one thing:  "[t]he focus of [a] willful blindness instruction must be on the particular defendant and not on the hypothetical reasonable person."  United States v. Griffin, 524 F.3d 71, 80 (1st Cir. 2008); see generally Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2070 & n.9 (2011) (distilling from willful-blindness cases "two basic requirements" – "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact") (citing, among other cases, United States v. Pérez-Meléndez, 599 F.3d 31, 41 (1st Cir. 2010)).  Faced with a properly preserved challenge like this one, we give fresh review to whether the instructions contained "an error of law" but abuse-of-discretion review to whether they "adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues."[5]  United States v. Jadlowe, 628 F.3d 1, 14

_____

acted in good faith, he cannot be guilty of the crime. The burden to prove intent, as with all other elements of the crime, rests with the government.

[5] Aside from raising the specter of jury confusion, Denson does not contest the judge's decision to offer the willful-blindness instruction in the first place.  See generally United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009) (noting that a willful-blindness instruction is justified if the defendant

-7-

(1st Cir. 2010) (internal quotation marks omitted); <u>accord</u> <u>United</u> <u>States</u> v. <u>Gonzalez</u>, 570 F.3d 16, 21 (1st Cir. 2009). Ultimately, despite what Denson says, we believe that the instructions focused the jury's attention on him.

What the judge said (emphasis ours) is that the jury could find that "<u>the defendant</u> acted knowingly . . . if <u>he</u> deliberately" turned a blind eye "to a fact that otherwise would have been obvious to <u>him</u>." "[T]o infer knowledge," the judge added, the jury had to conclude "that <u>the defendant</u> was aware of a high probability of the fact in question" and "that <u>the defendant</u> consciously and deliberately avoided" confirming that fact – in other words, "<u>the defendant</u> willfully made <u>himself</u> blind to that fact." And it was up to the jury "to decide whether <u>he</u> deliberately closed <u>his</u> eyes to the fact and, if so, what inference, if any," to draw. Obviously, fairly read, the charge's references to "the defendant," "he," "his," "him," and "himself" all refer to Denson, and not to some generic reasonable person, as Denson would have us believe. The long and the short of it is that

_____

disclaims knowledge of the wrongdoing but the facts indicate "a conscious course of deliberate ignorance" – adding also that the charge, taken in context, cannot be misunderstood as mandating an inference of knowledge). Had he done so, that might have affected how we set up the standard of review. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Mitrano</u>, 658 F.3d 117, 123 (1st Cir. 2011) (pointing out that we have used "'both <u>de novo</u> and deferential standards of review'" when reviewing a defendant's preserved challenge to the giving of a willful-blindness instruction) (quoting <u>Azubike</u>, 564 F.3d at 66 n.5), <u>cert. denied</u>, 132 S. Ct. 2117 (2012). But since he has not, we can move on.

this instruction squares with our cases[6] – even Denson does not suggest otherwise – and could not have misled the jury into applying a reasonable-person standard. Consequently, Denson's first argument goes nowhere.

Targeting the good-faith instruction, Denson tells us next that that charge was less than what he deserved because (despite his request) it did not "clarify" that good faith turned on what he subjectively believed instead of what some reasonable person would have believed. We will reverse a decision like this one only if the rejected charge was (a) substantively correct, (b) not substantially covered by other instructions, and (c) so essential to an important point in the trial that failure to give it seriously impaired the defendant's ability to defend himself. See, e.g., United States v. Dunbar, 553 F.3d 48, 62 (1st Cir. 2009) (discussing an abuse-of-discretion standard of review). It is a rare case where all of these conditions are met, see United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001), and this is not that case – not by a long shot.

To speed things up, we focus in on (b) – whether Denson's rejected instruction was covered by the given charge – and remind the reader that the judge told the jury (again, emphasis ours) that "if the defendant" – meaning Denson – "acted in good faith" then

_____

[6] See, e.g., De Jesús-Viera, 655 F.3d at 59; United States v. Singh, 222 F.3d 6, 11 n.4 (1st Cir. 2000); United States v. Gabriele, 63 F.3d 61, 66 n.6 (1st Cir. 1995).

-9-

"he" could hardly be guilty of wire fraud. The judge had the jury concentrate on Denson's actual, subjective beliefs after all, which means that his charge basically did what Denson wanted it to do. Conscious that judges generally need not mimic the precise wording of a party's preferred instruction, see, e.g., United States v. Barnes, 251 F.3d 251, 260 (1st Cir. 2001), we easily reject Denson's whole line of attack on the good-faith charge.

In a parting shot, Denson blasts the judge for giving the willful-blindness and good-faith charges back-to-back. He did not make this claim below, though, so we review only for plain error, which means he "must show (1) error, (2) plainness, (3) prejudice, and (4) an outcome that is a miscarriage of justice or akin to it." United States v. Edelkind, 467 F.3d 791, 797 (1st Cir. 2006). Denson's big problem is that his criticism is a throwaway, made in a single sentence with no citations or argument to show how the judge's ordering of the instructions was error, let alone plain error. That does not suffice, obviously. See, e.g., United States v. Tan, 674 F.3d 103, 111 n.7 (1st Cir. 2012). And, if more were needed, having rejected challenges first to the willful-blindness charge and then to the good-faith charge, we believe that complaints about the instructions' sequencing cannot succeed in any event. See, e.g., Prigmore, 243 F.3d at 17 (explaining that judges have "considerable" leeway in how they "formulate[], structure[], and word[]" their jury charges); see generally Texas & Pac. R.R. v.

-10-

<u>Jones</u>, 298 F.2d 188, 191 (5th Cir. 1962) (noting that because "neither judge nor jury can contrive, communicate or assimilate complex knowledge with the superhuman speed of a data computer, . . . the law as it is laid down must perforce come word by word, sentence by sentence" – with "[s]omething . . . com[ing] first, something last," naturally – which means that the "burden . . . is a heavy one in demonstrating that an error has come about from sequential arrangement of sentences"). Again, there is no error, say nothing of plain error.

## SENTENCING

Moving past the jury instructions, we turn to Denson's sentencing arguments. Each has to do with the judge's handling of 18 U.S.C. § 3553(a) – a statute that sets out factors designed to help judges exercise their sentencing discretion. A partial list of those factors includes "the nature and circumstances of the offense and the history and characteristics of the defendant," plus the need to deter criminal conduct, protect the public, and provide the defendant with necessary medical care. 18 U.S.C. § 3553(a)(1), (a)(2)(B)-(D). And at the end of the day, the sentences imposed must be sufficient but not greater than necessary to serve these factors. <u>Id.</u> § 3553(a).

We typically examine sentencing decisions for abuse of discretion, which is really a review for reasonableness. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Gallardo-Ortiz</u>, 666 F.3d 808, 811 (1st Cir.

-11-

2012). Reasonableness has two aspects – procedural and substantive. See id. Denson accuses the judge of overlooking his terminal illness, infracting, he says, both § 3553(a)(1) (directing judges to consider the defendant's history and characteristics) and (a)(2)(D) (telling judges to ponder the defendant's medical needs). This sounds like a procedural-reasonableness-type claim. See United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011). Denson also accuses the judge of placing too much weight on the need to protect the public. And that has the feel of a substantive-reasonableness-type claim, see id. at 592, which depends largely on whether the sentence imposed represents a defensible result supported by a plausible rationale, see United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008). Before we address these arguments, though, we need to get a couple of things straight.

Denson is not entirely clear about which sentence he has a problem with – the within-guidelines sentence of 30 months for the wire-fraud convictions or the above-guidelines sentence of 15 months for the supervised-release violations. Some parts of his brief suggest that he is only concerned with the "within-the-range sentence," but others sort of target both groups of sentences. We will give him the benefit of the doubt on this, which segues neatly into another issue. The government tells us that Denson has either waived or forfeited any challenge to the within-guidelines sentence

-12-

because he basically got the sentence that he asked for.  Denson's reply brief goes on explaining why the government is wrong about that.  Again, we will give him the benefit of the doubt and assume for argument's sake that no waiver or forfeiture happened.  <u>See</u> <u>United States</u> v. <u>Mateo-Espejo</u>, 426 F.3d 508, 512 (1st Cir. 2005) (taking that tack in a similar situation).  Now, on to the merits of Denson's sentencing claims, which are easily resolved.

Denson's health was very much front and center for sentencing purposes.  The probation office's presentence report on the wire-fraud convictions noted that Denson has a condition called "pure autonomic failure" (an incurable degenerative neurological disorder), which, the report added, might justify a downward departure under the sentencing guidelines.  And the probation office's report on the revocation violations also pointed out Denson's disorder and listed some of the symptoms.

Denson drove these points home in his sentencing memo, stressing that his illness causes (among other things) periodic drops in blood pressure, which reduces oxygen flow to the brain. His counsel stayed with that theme at the two sentencing hearings, telling the judge that Denson's "physical problem is going to cut his life short" and that "he's already . . . on borrowed time."[7]

---

[7] Recall that the judge handed down the sentences all on the same day, with the sentences for the wire-fraud crimes coming during a morning hearing and the sentences for the supervised-release offenses coming during an afternoon session held some 30 minutes later.  The second hearing took less time than the first,

Even a five-year term may be a "life sentence" for him, counsel added. And Denson struck the same note in his statements to the judge before being sentenced (his "allocution," in legal lingo). "I've outlived [my] life [expectancy]," he said at the first sentencing hearing. "It's a very rare, rare illness," he explained, "[a]nd the older I get, the more it affects me." "[M]y life just went . . . spiral[ing]" out of control after being diagnosed with this "very rare" disorder, he emphasized at the second hearing.

Having read probation's presentence report, reviewed the parties' memos, considered counsel's arguments, and listened to Denson's statements (all of which, again, spotlighted Denson's disorder), the judge ran through the § 3553(a) factors and imposed a within-guidelines sentence of 30 months for the wire-fraud offenses. Touching on Denson's illness, the judge said that that sentence best serves the goals of § 3553(a), and will (among other things) drive home the point "that further conduct of this type" will lead to "an even longer sentence" – which, given "his present condition," might result in his "spend[ing] the rest of his life in prison." From the circumstances present – the papers filed, the arguments made, the statements given, etc. – we have no trouble concluding that, despite what Denson now claims, the judge did

---

no doubt because the lawyers, rather than repeating themselves, incorporated by references their earlier arguments.

factor this disorder into the sentencing calculus for the wire-fraud crimes.

The same is true about the above-guidelines sentence of 15 months for the supervised-release violations. Explaining his sentencing decision, the judge labeled "egregious" Denson's blowing his supervised release by doing the exact same things that had landed him on supervised release to begin with. And then the judge ruled that a guidelines sentence would not do – though he did not specifically mention Denson's disorder, as he had at the just-concluded wire-fraud-sentencing hearing. But at the risk of becoming tedious, we repeat that Denson's malady had a starring role in both hearings – again, thanks to probation's presentence and revocation reports, the combatants' memos, the lawyers' oral presentations, and Denson's allocutions – so we can and do infer from this that the judge thought about the health issue before selecting a sentence. See, e.g., United States v. Vargas-Dávila, 649 F.3d 129, 130 (1st Cir. 2011); Dávila-González, 595 F.3d at 48-49; United States v. Turbides-Leonardo, 468 F.3d 34, 40-41 (1st Cir. 2006).

Denson's claim that the judge fixated obsessively on public protection fares no better. To back up his charge, Denson points us to the judge's comment that the "real issue" in trying to come up with the right sentence for the wire-fraud crimes was how to protect the public. Denson neglects to mention that his counsel

-15-

agreed with the judge – "[c]orrect, your Honor," she said.  Once again, we put aside any concerns about waiver or forfeiture, because Denson's obsession argument does not work even if properly preserved.

Hot on the heels of this exchange, the judge called public protection "[o]ne of the issues" that he had to deal with. What was troubling to the judge was defense counsel's saying that Denson really believes in his heart of hearts that the millions overseas were still his for the taking, which, the judge added, raised the real possibility that "as soon as he [got] out" of prison he would backslide like he had before.  In almost the same breath, the judge mentioned the need to deter Denson from committing future crimes, given his serial history of wire fraud, and, moments later, the judge also took account of the other § 3553(a) factors, including Denson's history and characteristics, the seriousness of the offense, and the need to promote respect for the law.  The judge again touched on many of these same concerns at the revocation hearing by calling what Denson had done "egregious."

We see nothing reversible here.  A judge need not mention every § 3553(a) factor nor intone any particular magic words.  See, e.g., United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006). And certainly a judge need not give each factor equal billing.  See id.  The reason for this is simple:  because sentencing decisions turn mostly on "case-specific and defendant-specific" concerns,

-16-

"[t]he relative weight of each factor will vary with the idiosyncratic circumstances of each case," so the judge "is free to adapt the calculus accordingly." Id. (internal citation omitted). And having read the record as a seamless whole, we remain convinced that the judge did his duty, offering up an analysis that is specific and plausible enough to stand. See, e.g., Clogston, 662 F.3d at 592-93; Martin, 520 F.3d at 96. Sure, the judge's explanation for the revocation sentence was somewhat short. But "'brevity'" is not the same as "'inattention,'" United States v. Madera-Ortiz, 637 F.3d 26, 31 (1st Cir. 2011) (quoting Turbides-Leonardo, 468 F.3d at 42), and we deem it sufficient under our caselaw, for the reasons just given.

The upshot is that the challenged sentences are procedurally sound and substantively reasonable. And that is that.

## WHAT THIS ALL MEANS

Our work over, we **affirm** the judgments below in all respects.