# United States Court of Appeals
## For the First Circuit

No. 13-1643

UNITED STATES,

Appellee,

v.

PETER DIROSA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Alan D. Campbell for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with
whom Thomas E. Delahanty II, United States Attorney, was on brief,
for appellee.

August 4, 2014

**THOMPSON, <u>Circuit Judge</u>**.  Peter DiRosa was sentenced to 57 months in prison after a jury found him guilty of one count of wire fraud.  The charge resulted from a transaction in which DiRosa and an associate, Thomas Renison, convinced then-75-year-old Frank Jablonski to invest $600,000 in an elaborate scheme surrounding a real estate development project in Polgardi, Hungary.  On appeal, DiRosa challenges the denial of his sufficiency-of-the-evidence-based motion for acquittal, the admission of certain testimony, and his sentence.  After careful consideration, we wholly affirm.

## BACKGROUND

### A. The Dynamic Duo

Ironically DiRosa and Renison met some eleven years ago while both were involved in charitable work for the same parish.  Renison was a 25-year veteran in the insurance and finance businesses.  DiRosa, according to his introduction, was a project developer in eastern Europe.  DiRosa said his current venture involved building a resort in Polgardi, Hungary showcasing the country's natural hot springs, a popular tourist attraction.  The resort, he boasted, would also have several golf courses, and eventually a casino, for guests to enjoy.

DiRosa told Renison that he had already met with several high-ranking Hungarian officials who were on board with the project, as well as an architect and advertising executive from New York.  He also represented that the project was very close to being

funded and the land very close to being secured.  DiRosa asked Renison to be a "type of [] partner in the deal" and be primarily responsible for overseeing the administration of benefits for the resort's estimated two to three thousand potential employees. Additionally, Renison, a self-proclaimed "avid golfer," would be given the opportunity to work with a golf majors champion to create and manage the resort's courses, notwithstanding his lack of experience in golf course management.

DiRosa and Renison traveled to Hungary on a number of occasions - mostly on Renison's dime - to check in on the project's progress.  While on these trips, the pair often met with, among others, the attorney for the project, Ildiko Sardy, and Sardy's husband, Janos Danyi, who was the project's accountant.

## B. Jablonski's "Investment"

When all the shenanigans with Jablonski began, he was a 75-year-old retiree who had been living with his wife, Marguerite, in Kennebunk, Maine.  Prior to retiring, Jablonski made a living as a management consultant.  After his employer discontinued its management of Jablonski's 401(k) account, Jablonski found himself in need of financial planning services.  At that time, Jablonski had been working with an insurance broker to obtain medical insurance for himself and his wife.  The broker referred him to Renison, who Jablonski ultimately hired to invest his retirement funds into a variable annuity.

-3-

In May 2008, DiRosa told Renison that his project needed an investor – one who was willing to provide $600,000 to be placed in an escrow account and used as collateral to purchase farmland in Hungary that would be converted into commercial property. Renison immediately thought of Jablonski as the ideal candidate for the investment.

Renison contacted Jablonski about the investment opportunity and, over the course of several conversations (both on the telephone and at Jablonski's home), he promoted the duo's idea. While Renison did most of the talking during the "[t]wo or three" meetings that were conducted over the course of a week or two, DiRosa was always present. Jablonski was told that he would receive a $400,000 profit for his investment, would be reimbursed for the $52,000 surrender charge he would incur for withdrawing the money prematurely from his retirement account, would earn interest on the money while it sat in the escrow account, and would receive $6,500 per month to replace the income he would lose from taking the money out of the annuity. In addition, he was assured that his money would never leave the escrow account. That entire process, Renison declared, including recoupment of all profits and fees, would take six months at the most, and in actuality he expected it would wrap up much sooner. As Renison delivered his spiel, DiRosa never corrected, clarified, or contradicted any of the assertions Renison made.

Jablonski was also given written materials compiled by DiRosa that purported to describe the project in more detail, including a marketing brochure about the resort and an accounting report. The brochure contained information about the resort's key management and its advisory board, boasting a membership cohort of prominent public figures such as a U.S. Congressman and a professional golfer (the same one with whom Renison was supposed to manage the resort's golf course). The accounting report represented that the project was slated to make a $29 million dollar profit in its first year. What Jablonski was not told, however, was that this advisory board was not only nonoperational, it was nonexistent, and that the $400,000 profit he was promised was contingent on the project being fully funded, which, of course, at the time it was not.

Convinced he would be foolish to pass on such a promising investment, on May 27, 2008, Jablonski signed a loan document drafted by DiRosa reflecting the terms of their agreement. Because of his prior relationship with Jablonski, Renison, rather than DiRosa, signed the agreement. The next day, the pair accompanied Jablonski to a local bank to facilitate the wiring of the funds overseas. DiRosa had a heavy hand in this process, assisting the bank tellers and Jablonski throughout. Bank records indicate that on June 3, 2008, $600,000 was transferred from Jablonski's account

to an account in Hungary held in the name of Sardy & Associates Attorneys.

### C. Have Funds, Will Travel

Following the June 3rd transfer, Jablonski's $600,000 went on a whirlwind world tour. Between June and September 2008, the funds were transferred back and forth numerous times between several Hungarian accounts held by Sardy. Additionally, during that time and over the course of several transactions, approximately $100,000 in cash was withdrawn from one of Sardy's accounts. In September 2008, approximately $518,000 was transferred via two separate transactions from Sardy's account into an Austrian bank account in the name of Danyi (remember, he is Sardy's husband). Eventually, $225,000 of that money came back stateside and was transferred from Danyi's account to an account held in the name of DiRosa's wife, Eileen.

A few months later, Renison and DiRosa met up and Renison confided that things for him were "kind of financially tight." DiRosa indicated that he could loan Renison some money, and shortly thereafter, Renison had two checks in hand, one in the amount of $100,000 and the other in the amount of $5,000. Both checks were written out of Eileen DiRosa's account, which the $225,000 had gone

into earlier. When Renison asked DiRosa where he got the money from, DiRosa said a friend named "Ernie" had lent it to him.[1]

Unfortunately for Jablonski, the funds traveled everywhere except back to him. Six months after the transfer - the maximum amount of time Renison had said it would take Jablonski to recoup his investment - Jablonski had been repaid a mere $60,000, which he assumed to be the ten percent interest his investment had yielded while in the escrow account. Jablonski was promised an additional $100,000 for the delay, but alas never saw a dime more. Throwing salt on the wound, Jablonski belatedly found out he was going to be hit with a hefty tax bill; because he pulled the funds from his retirement account, he was taxed based on an annual income of $700,000 instead of his usual $100,000.

Finally suspecting something was awry, Jablonski and his wife filed a civil suit against DiRosa. Their attorney communicated with both DiRosa and Sardy via email on several occasions, but attempts to secure an accurate status on the funds owed to Jablonski - much less the money itself - remained fruitless.

Perhaps feeling he had reached a dead end, the Jablonskis' attorney contacted the Federal Bureau of Investigation. After the FBI interviewed the Jablonskis, DiRosa, and Renison, among

---

[1] DiRosa later admitted in his testimony that he lied to Renison about where the money came from, and that he had actually received it from a line of credit on the property in Hungary that he asked Sardy to arrange.

others, on May 24, 2011, the government filed a criminal complaint against both DiRosa and Renison in the United States District Court for the District of Maine.  The complaint alleged that Renison and DiRosa conspired to commit wire fraud and committed wire fraud in violation of 18 U.S.C. § 1343.  A grand jury indicted DiRosa on the wire fraud charge only, and the complaint against Renison was dismissed with the government's consent.  DiRosa pleaded not guilty.

## D. DiRosa's Trial and Sentencing

A three-day jury trial began on January 28, 2013.  During trial, the jury heard testimony from, among others,[2] DiRosa, Jablonski, and Renison (he was testifying under a grant of immunity).  The district court twice denied DiRosa's oral motion for judgment of acquittal and the jury found him guilty.

DiRosa's sentencing hearing took place a few months later.  The U.S. Sentencing Guidelines (the "Guidelines") called for a sentence between 46 and 57 months, however, the district court judge increased the range to 57 to 71 months, finding that false (and perhaps perjurious) statements made by DiRosa throughout the proceedings warranted an obstruction of justice enhancement.  At the sentencing hearing, the district court heard statements from supporters on both sides.  On one side, Jablonski's son described the toll the fraud took on his parents.  On the other, DiRosa's wife

---

[2] We will address the testimony of two such individuals shortly.

and several of his friends vouched for his good character and commitment to his family. They also noted his years of public service, which included a 14-year stint on the board of directors for the town of Manchester, Connecticut, as well as his serving as the town's deputy mayor and mayor.

The government requested the full 71 months because of the nature and severity of DiRosa's lies, Jablonski's substantial financial loss, and DiRosa's apparent lack of remorse for his actions. DiRosa requested a dramatic downward variance - a 30-day prison term followed by 14 months of home confinement - based primarily on his age, prior public service, family ties, and the need to care for his ill wife, her mother, and his aging father.

The district court sentenced DiRosa to 57 months in prison - the very lower end of the enhanced guideline range - to be followed by three years of supervised release. The district court described DiRosa's conduct as "a most serious offense" and also suggested that DiRosa felt no remorse for his actions. Indeed, the district court thought DiRosa was "still taking that Kool-Aid of this Polgardi castle." DiRosa timely appealed. He raises several issues for our consideration.

## DISCUSSION

### A. Motion for Acquittal

DiRosa first argues that the district court should have granted his motion for acquittal because the government failed to

prove that he made any false statements to Jablonski, an essential element of wire fraud.  We review the district court's denial of a motion for acquittal de novo, and must "decide whether, after assaying all evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006).  We "need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy [ourselves] that the guilty verdict finds support in a plausible rendition of the record."  Id.  We have described the barriers to challenging a motion for acquittal as "daunting."  Id.

"[T]he elements of wire fraud are a 'scheme to defraud,' the accused's 'knowing and willful participation in the scheme with the intent to defraud,' and the use of interstate or foreign 'wire communications' to further that scheme."[3] United States v. Denson 689 F.3d 21, 24 (1st Cir. 2012), cert. denied, 133 S. Ct. 996 (2013)(quoting United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993)).  The misrepresentations made with the intent to defraud must be material, which we have described as having "a natural tendency to influence, or is capable of influencing, the decision"

---

[3] There is no dispute that foreign wiring was used to wire Jablonski's money from his bank in Maine to Sardy's bank in Hungary.

of the person or persons it is addressed to. Méndez Internet Mgmt. Servs., Inc. v. Banco Santander de Puerto Rico, 621 F.3d 10, 15 (1st Cir. 2010).

DiRosa claims that "there was no evidence that he made a material, false representation that caused Jablonski to wire funds to Hungary." That is, DiRosa says that Renison did all of the talking during their meetings, as well as provided Jablonski with all of the written materials (including the loan document), and that it was Renison, and not DiRosa, who caused Jablonski to wire the funds. But this claim is superficial.

In United States v. Woodward, 149 F.3d 46 (1st Cir. 1998), the defendant made an argument much like the one DiRosa makes here. In that case, the defendant, a Massachusetts state representative, was convicted of (among other things) wire fraud based on telephonic communications that were used to book a hotel room in Florida for a conference, at which the defendant was planning to "accept[] gratuities . . . with the intent to defraud the public of its right to his honest services." Id. at 63. The defendant, himself, did not actually make the call to reserve the room so he argued that he had not caused the use of interstate wiring (that being the telephone call) to effectuate the meeting. Id. at 63-64. We affirmed his conviction and said it was enough that the defendant could have reasonably foreseen that the reservation was going to be made for him and that the use of

-11-

interstate wiring (i.e., a telephone call) would be used to secure it.  Id.  Because the call secured the hotel room, which in turn ensured the location for the fraudulent gratuity to be exchanged, the call "played an essential role in the scheme." Id. at 64.

Our reasoning in Woodward sinks DiRosa's argument.  He claims that his participation was merely incidental to causing Jablonski to wire the money and that it was Renison who did all the heavy lifting.  Even assuming this to be the case, it was certainly reasonable for DiRosa to foresee - and indeed it was what he hoped for - that the misrepresentations Renison made would result in the foreign wiring of funds for his Hungarian real estate development project.  The misrepresentations were undoubtedly material as well, given that their very purpose was to convince Jablonski to wire the funds.  Further, the use of international wiring here played even more of an essential role in DiRosa's scheme than did the telephone call in Woodward.

Even putting all that aside, there is more.  The government presented evidence that DiRosa was in charge of creating some of the critical marketing material that was presented to Jablonski, namely the pamphlets which listed the advisory board and board of directors working on the project as well as the project's profit report.  DiRosa's own testimony revealed that at the time the material was presented to Jablonski, no such advisory board existed but rather it was more of a "wish list" of individuals he was hoping

-12-

would come on board. The highly recognizable six-time professional golf champion was therefore not a member of the non-existent advisory board, and neither was the Congressman. The board of directors, consisting of "top European and American executives," did not exist. Not only was DiRosa not the president of Resort Holdings International as represented in the brochure, he testified at trial that he could not remember whether the company had ever even existed. And, not surprisingly, the materials failed to mention the fact that the project was not yet fully funded. DiRosa was also the one who assisted in the actual wiring of the funds at Jablonski's bank. On top of all that, we have the fact that $225,000 of Jablonski's money ended up in DiRosa's wife's bank account.

Given all this, there was no shortage of evidence in the record from which a jury could have reasonably concluded that the government proved all of the essential elements of wire fraud under 18 U.S.C. § 1343. See, e.g., United States v. Appolon, 715 F.3d 362, 369 (1st Cir. 2013) (affirming defendant's wire fraud conviction, finding that despite defendant's claim that he played a peripheral role in a mortgage fraud scheme a "compilation of evidence [gave] rise to the reasonable inference" that he was an "active participant in the transaction" who acted with the specific intent to defraud).

## B. Admission of Kiselak's and Mesite's Testimony

DiRosa also has qualms about the district court's admission of testimony at various points within the trial. His first claim of error relates to the testimony of Stephen Kiselak and Stephen Mesite, two individuals that DiRosa had solicited in the late 1990s and in early 2000 to invest in the same Hungarian development project.

Prior to trial, the government moved <u>in</u> <u>limine</u> to admit the Kiselak and Mesite testimony, pursuant to Federal Rule of Evidence 404(b),[4] arguing that the testimony was specially relevant to prove DiRosa's intent to defraud Jablonski because he used the same representations, promised the same "exceedingly high, and exceedingly rapid, returns on the victims' investments" and, like for Jablonski, "the promised returns did not materialize." In response, DiRosa argued that this "prior bad act evidence" should be excluded because it tended to show his propensity to commit crime and was unfairly prejudicial. DiRosa also argued that the transactions involving Kiselak and Mesite were too remote in time to warrant admissibility, since they occurred some ten years prior to his interaction with Jablonski.

---

[4] This rule prohibits the admission of evidence of "a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence may be admissible for other purposes, including to prove, among other things, intent. <u>Id.</u> at 404(b)(2).

The district court granted the government's motion, finding it "readily apparent that these other acts have special relevance because of the 'degree of similarity to the charged [wire fraud] crime.'" The district court also stated that these incidents showed that DiRosa "had reason to know" that when he solicited Jablonski for funds, that Jablonski would not receive any return on his investment. At the outset of trial, DiRosa's attorney urged the court to reconsider its ruling, but the court declined to do so, and the pair went ahead and testified. On the stand, Kiselak and Mesite described loans they had given to DiRosa for the same development project in Hungary, neither of which had ever been repaid, and which were based on false promises similar to those Renison and DiRosa offered to Jablonski.

On appeal, DiRosa makes the same claims he did below, i.e., the evidence proffered by Kiselak and Mesite was highly prejudicial, minimally probative, and the incidents too remote in time. We review the district court's admission of prior-acts evidence under Rule 404(b) for abuse of discretion. See United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013); Appolon, 715 F.3d at 372-73.

Normally our inquiry is twofold. We first consider whether the evidence has special relevance under Rule 404(b), and then next determine whether, pursuant to Rule 403, the disputed evidence, even if specially relevant, should nonetheless be excluded

based on considerations of unfair prejudice.  See United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000).  DiRosa cites both Rule 404 and Rule 403 in his brief but at oral argument his counsel pressed the Rule 403 prejudice piece, conceding that the subject testimony had some relevance.  As a result, we bypass the question of special relevance and proceed to a Rule 403 inquiry.

Federal Rule of Evidence 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."[5]  Fed. R. Evid. 403; see also Doe, 741 F.3d at 229.  Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997).  We stress that "it is only unfair prejudice which must be avoided . . . because [b]y design, all evidence is meant to be prejudicial."  Varoudakis, 233 F.3d at 122 (internal citation omitted).

---

[5] Rule 403 offers up some other bases for exclusion, namely "confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  We see no indications that any of these grounds justify exclusion. DiRosa does not suggest otherwise, except for one brief reference to the potential for the testimony to "confuse[] the jury as to what DiRosa was on trial for."  However, DiRosa only argues the unfair prejudice piece of Rule 403, and so any claim related to juror confusion is waived.  See González-Morales v. Hernández-Arencibia, 221 F.3d 45, 48 n.3 (1st Cir. 2000) (finding that the parties' failure to develop the argument waived it).

Here, both Kiselak's and Mesite's testimony was highly probative. The testimony was offered to show that DiRosa acted with the intent to defraud Jablonski - an essential element of the charged crime - because DiRosa employed similar tactics and offered similar false promises to solicit money from Kiselak and Mesite. Indeed, the similarity is quite uncanny (a fact which makes us less concerned than DiRosa with the decade-long gap between the pitches). As with Jablonski, DiRosa promised that Kiselak's and Mesite's investments would be repaid promptly, and that they would be profitable, but these promises never came to fruition. In that same vein, the testimony is probative of the fact that when DiRosa solicited the investment from Jablonski, he arguably knew, based upon his prior dealings with Kiselak and Mesite, that Jablonski would not be recouping his investment (let alone a profit) within six months as was promised, if ever. DiRosa was soliciting money from Jablonski to fund the very same project that ten years earlier had failed to materialize.

Though the close similarity between DiRosa's interactions with Kiselak/Mesite and Jablonski certainly puts us on alert for possible unfair prejudice resulting from criminal propensity evidence, we are satisfied that is not what happened here. See Old Chief, 519 U.S. at 180-81 (explaining that, under 403, one improper ground for conviction is "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did

-17-

the later bad act now charged"). Criminal propensity considerations need to be taken "in light of the totality of the circumstances, including the government's need for the evidence given other available testimony, to prove the issue identified pursuant to the 404(b) special relevance analysis." Varoudakis, 233 F.3d at 122. In the instant matter, Kiselak's and Mesite's testimony was crucial to the government's case, as it was the only evidence available to show that at the time he approached Jablonski for the money for his project in Hungary, DiRosa had reason to believe that Jablonski was not likely to recoup any, much less all, of his investment. DiRosa points to no "other, non-prejudicial evidence" the government could have used instead.

An abuse of discretion showing is not an easy one to make. We afford deference to the district court's weighing of probative value versus unfair effect, only in "extraordinarily compelling circumstances" reversing that "on-the-spot judgment" from "the vista of a cold appellate record." Doe, 741 F.3d at 229. This is not one of those circumstances. The court did not abuse its discretion in admitting the testimony.

### C. Admission of Jablonski's Testimony

Next, DiRosa argues that the district court erred in allowing Jablonski to testify at length as to statements made by Renison during their meetings because the statements are inadmissible hearsay. The district court allowed the testimony in as statements

-18-

made by a co-conspirator, and DiRosa argues that this was error because the government failed to prove by a preponderance of the evidence that he and Renison were acting in a conspiracy. The government retorts that the testimony was indeed admissible as co-conspirator statements, see Fed. R. Evid. 801(d)(2)(E), or in the alternative as adoptive admissions, see id. 801(d)(2)(B). We agree the testimony was properly admitted by the court under the co-conspirator/joint venture aegis.[6]

Our review of the district court's decision on this issue is for plain error only, as DiRosa seems to concede[7] in his brief that he did not properly preserve his objection[8] to the testimony at trial. See United States v. Sánchez-Berríos, 424 F.3d 65, 73 (1st Cir. 2005). "Review for plain error entails four showings: (1) that

_____

[6] Given this determination, we need not delve into the merits of the government's adoptive admissions argument, see United States v. Miller, 478 F.3d 48, 51 (1st Cir. 2007) (explaining the doctrine of adoptive admissions rests on the notion that "a party's agreement with a fact stated by another may be inferred from (or 'adopted' by) silence"), though, at a minimum, the argument has some surface appeal.

[7] In his brief, DiRosa says that he raised an objection to Jablonski's testimony at trial, but he concedes that the objection was "perhaps belated[]" and proceeds to fashion his argument under the plain error standard of review.

[8] We do not mean to imply that DiRosa's counsel should have objected to the testimony. The decision not to object may indeed have been a tactical one, e.g., Jablonski's testimony could have persuaded the jury that the more vocal Renison was the one to blame. See Strickland v. Washington, 466 U.S. 668, 689 (1984)(recognizing that counsel has "wide latitude" when making tactical decisions). In any event, it is not an issue we need to decide.

-19-

an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy."  To admit a statement under this rule, four elements must be satisfied by a preponderance of the evidence: (1) the existence of a conspiracy; (2) the defendant's membership in the conspiracy; (3) the declarant's membership in the conspiracy; and (4) that the declarant's statement was made in furtherance of the conspiracy. United States v. Colón-Díaz, 521 F.3d 29, 35-36 (1st Cir. 2008).

Here a preponderance of the evidence showed that a conspiracy existed, and both DiRosa and Renison were part of it. First, the complaint charged both DiRosa and Renison with conspiracy. The fact that DiRosa was not ultimately indicted for conspiracy, or that Renison was not named as a co-conspirator, is not especially surprising given that Renison testified for the government under a grant of immunity.  Nor is it particularly important that DiRosa was not so indicted, as the applicability of the co-conspirator exception is not conditioned on a conspiracy being charged in the indictment. See United States v. Washington, 434 F.3d 7, 13 (1st Cir. 2006).

-20-

Further, the testimony offered at trial established the relationship between DiRosa and Renison, as well as their combined goal of getting Jablonski to invest in the Hungarian project. And it was also established that DiRosa was no uninformed, innocent bystander during the meetings with Jablonski. He knew that virtually all of the supposed chapter and verse that Renison presented to Jablonski was false, yet by his own admission DiRosa took no exception to any of Renison's statements. On top of that, he benefitted handsomely from Renison's lies, with $225,000 of Jablonski's money ending up in DiRosa's wife's account. A feat made possible when DiRosa - in what can certainly be characterized as a ratification of all that Renison said - assisted in effectuating the wire transfer at the bank.

The court also supportably found that Renison's comments were in furtherance of DiRosa and Renison's joint venture. Surely it would be difficult to fashion a workable argument to the contrary. It is clear that Renison's touting of the project's laurels was done in an (ultimately successful) attempt to get Jablonski to hand over his savings. See United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002) (providing that generally speaking "a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy").

In sum, we see no reason to conclude that the district court erred, plainly or otherwise, in admitting the testimony against

-21-

DiRosa.  Because we discern no error, we need not address the remaining prongs of the plain error test.

### D. Sentence

Finally, DiRosa takes issue with the district court's imposition of a 57-month, within-Guidelines sentence.  Our review of sentencing decisions is for abuse of discretion, which, as we have said, is really an assessment for reasonableness.  See Denson 689 F.3d at 26.  Our assessment "involves a procedural as well as a substantive inquiry."  United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008)(citing Gall v. United States, 522 U.S. 38, 51 (2007)).  This means we first decide whether the district judge made any procedural missteps, such as improperly calculating the Guidelines range or failing to adequately explain the sentence.  See id.  And then we move on to whether the sentence imposed is actually substantively reasonable.  See id.  A plausible rationale and defensible result is the so-called "linchpin of a reasonable sentence."  United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008).

DiRosa frames his challenge solely as a substantive one but in reality - though the dividing line between these two types of challenges is not the clearest - he appears to be mounting more of a procedural attack.  Particularly, he complains that the district court failed to adequately explain why it would not award DiRosa the reduced sentence he sought based on the various mitigating factors advanced by DiRosa, e.g., his clean criminal record, history of

-22-

public service, and family care-taking responsibilities.  See Politano, 522 F.3d at 72 (providing failure to satisfactorily explain a sentence as an example of a procedural error).  Giving DiRosa the benefit of the doubt, we address both the procedural and substantive reasonableness prongs, starting with the former.

Simply said, we see nothing wrong with the district court's explanation of DiRosa's sentence.  To start, the district court considered many, if not all of the mitigating circumstances set forth by DiRosa.  In his sentencing colloquy, the judge noted several of DiRosa's virtuous personal characteristics.  He spoke about how friends and family had written letters and had spoken at DiRosa's sentencing hearing about his good character, and how they were shocked that he was involved in any type of criminal activity.  The judge also recognized that "for a number of years [DiRosa] was impassioned in his desire to serve the public."

While the district court may not have discussed each of the factors DiRosa set forth in turn (e.g., his clean record, age, and his responsibilities caring for his wife, her mother, and his father), the court need not explicitly do so in a checklist-type fashion.  See, e.g., United States v. Zapata, 589 F.3d 475, 487 (1st Cir. 2009) (stating that "[a]lthough the court did not explicitly discuss the personal characteristics of the defendant that were highlighted by defense counsel, that does not mean it failed to consider them").  Moreover, a within-Guidelines sentence, such as

DiRosa's, "requires less explanation" than one that falls outside the Guidelines. United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011). Here we have no trouble discerning the court's rationale; its explanation was sufficient.

By the same token, DiRosa's sentence was substantively reasonable. The court considered DiRosa's virtuous characteristics but found more significant "the nature and circumstances of the offense, the need to promote respect for the law, just punishment, and deterrence." Simply "identifying potentially mitigating factors" does not guarantee DiRosa that he will receive a reduced sentence. Madera-Ortiz, 637 F.3d at 30. Nor can DiRosa successfully challenge the substantive reasonableness of his sentence because the district court, when weighing his virtuous characteristics against the more nefarious factors (the deceit, loss, and harm resulting from his actions) came up with a sentence that disfavored him. See id.

The district court made a judgment call - well within the wide latitude it is afforded - and on balance, the court came up with a lower end of the Guidelines 57-month prison sentence. A successful challenge to a sentence falling within the Guidelines is not an easy one to make; "fairly powerful mitigating reasons" must be given and we must be persuaded that the district judge was "unreasonable in balancing pros and cons." United States v. Stone, 575 F.3d 83, 95 (1st Cir. 2009). DiRosa has made no such showing.

Left with no procedural blunders and an eminently reasonable sentence, we find the court did not abuse its discretion. DiRosa's sentence stands.

## CONCLUSION

For the reasons set out at length above, each of DiRosa's offerings on appeal fails to convince.  DiRosa's conviction and sentence are **AFFIRMED**.